IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NEIL H. HEUER<br>663 Hickory Road<br>Pine Ridge, FL 34108<br><br>On behalf of himself and all others<br>similarly situated<br><br>      Plaintiffs,<br><br>  v.<br><br>SMITHSONIAN INSTITUTION<br>A trust instrumentality of the United<br>States of America<br><br>and<br><br>United States of America<br><br>Serve on:  Judith Leonard - General Counsel<br>      Smithsonian Institution<br>      Office of General Counsel<br>      1000 Jefferson Dr. SW,<br>      Room 302, MRC 012<br>      Washington, DC 20013-7012<br><br>      Jessica Sanet<br>      Asst. General Counsel<br>      Smithsonian Institution<br>      Office of General Counsel<br>      P.O. Box 37012, MRC 012<br>      Washington, DC 20013-7012<br><br>      United States of America<br>      US Attorney General -<br>      US Department of Justice<br>      950 Pennsylvania Avenue, NW<br>      Washington, DC 20530 | Civil Action No. _____<br><br><br><br><br><br><br>CLASS ACTION COMPLAINT |

| | |
|---|---|
| **United States of America** | ) |
| **US Attorney for the District of** | ) |
| **Columbia -** | ) |
| **555 4th Street, NW** | ) |
| **Washington, DC 20530** | ) |
| | ) |
| | ) |
| _____ **Defendants**. _____ | ) |

## CLASS ACTION COMPLAINT

Plaintiff, Neil H. Heuer (hereinafter the "Named Plaintiff"), on his own behalf and on

behalf of the Class defined herein, by and through Counsel, hereby sues Defendants Smithsonian

Institution ("Smithsonian") and the United States of America ("USA") (collectively

"Defendants") and states as follows:

## I.     INTRODUCTION

1.     This is a consumer class action based upon Defendants violation of section

1681c(g) of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq., as amended* (the "FCRA").

Congress designed this section of the FCRA, like many others, to combat the rising tide of

identity theft experienced throughout the nation in recent years.

2.     Identity theft occurs when a consumer's personally identifiable information is

misused to commit fraud.

3.     The FCRA requires any entity that accepts credit or debit cards to restrict the

information it prints on sales receipts.  Such a practice, if followed, reduces an identity thief's

ability to obtain valuable account information relating to a consumer.

4.     Despite the simple steps necessary to comply, and despite abundant notice,

Defendants simply have chosen to ignore complying with certain provisions of the FCRA.

Specifically, on each receipt issued at the point of sale, Defendants printed the name of the

consumer, the first four digits of the credit card number and the last four digits of the credit card number.

5.      As such, consumers who purchase goods and services from Defendants do not receive the benefits that section 1681c(g) was designed to confer, and uniformly are burdened with an elevated risk of identity theft.

## II.     JURISDICTION AND VENUE

6.      This Court has jurisdiction under 15 U.S.C. § 1681p, 28 U.S.C. §§ 1331 and 1337.

7.      Venue is appropriate pursuant to 28 U.S.C. § 1391(b) because Defendants systematically and continually transact business in the District of Columbia, and because the cause of action set forth in this Complaint arose in the District of Columbia.

## III.    PARTIES

### A.      The Named Plaintiff

8.      Plaintiff Neil Heuer is an adult individual who resides at 633 Hickory Road, Pine Ridge, FL 34108.

9.      Plaintiff Heuer is a "consumer" under the FCRA, 15 U.S.C. § 1681a(c) because he is an individual.

### B.      The Defendants

10.     Defendant Smithsonian is a trust instrumentality of the United States of America which owns and operates IMAX theaters, numerous retail stores, a zoo and a planetarium, among others, throughout the District of Columbia, and which regularly conducts business in the District of Columbia.

Case 1:17-cv-00147   Document 1   Filed 01/23/17   Page 4 of 20

11.     Defendant Smithsonian is a "person" under the FCRA, 15 U.S.C. § 1681a(b) because Smithsonian is a "corporation, trust . . . governmental [] agency, or other entity."

12.     Defendant USA is a "person" under the FCRA, 15 U.S.C. § 1681a(b) because USA is a "government[.]"

## IV.     FACTUAL ALLEGATIONS

### A.     Defendants' Practice

13.     In 2004, the Department of Justice – Bureau of Justice Statistics determined that at least one member of 3.6 million households had been the victim of some form of identity theft in the prior six months. *See* Katrina Baum, Ph.D., *First Estimates from the National Crime Victimization Survey: Identity Theft, 2004* (April 2006) (attached hereto as **Exhibit A**).   The Federal Trade Commission recently estimated that over nine million Americans have their identities stolen each year.

14.     The President's Identity Theft Task Force, which was created by Executive Order #13402 (May 10, 2006), estimated that identity theft causes businesses and individuals billions of dollars a year in monetary losses. *See* President's Identity Theft Task Force, *Combating Identity Theft—A Strategic Plan* at 11 (April 2007) (attached hereto as **Exhibit B**).   Another survey conducted on behalf of the Federal Trade Commission concluded that the cost to individuals and businesses from identity theft is well over fifty billion dollars a year. *See* Synovate, *Federal Trade Commission – Identity Theft Survey Report* (September 2003) (attached hereto as **Exhibit C**).

15.     One practice commonly used by identity thieves is "dumpster diving." "Dumpster diving" is the practice of retrieving documents from unprotected trash receptacles. Section 1681c(g) of the FCRA restricts an identity thief's ability to acquire a consumer's

personal information from "dumpster diving" by truncating the consumer's credit card number and expiration date from the electronically printed receipt. **See Exhibit B** at 14-5.

16.     Because of the rise of identity theft, and the detrimental impact that it has on its victims, in 2003, the Fair and Accurate Credit Transactions Act ("FACTA") was enacted by Congress, and signed into law by President George W. Bush.  One of FACTA's primary purposes was to amend the FCRA through the addition of identity theft protections for consumers.

17.     One FACTA provision was specifically designed to thwart identity thieves' ability to gain sensitive information regarding a consumer's credit or debit account from a receipt which the consumer discarded or lost.  Codified at 15 U.S.C. § 1681c(g) (hereafter referred to as the "Receipt Provision"), this provision provides as follows:

> Except as otherwise provided in this subsection, no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of the sale or transaction.

*See* 149 CONG. REC. H12198-01 (2003) (comments of Rep. Maloney regarding how amendments "greatly enhances legal protections for identity theft victims").

18.     In enacting the Receipt Provision, Congress created a substantive right to informational privacy for consumers to have their personal credit card information truncated on printed receipts.

19.     FACTA gave companies that already had in place cash registers or other machines that printed electronic receipts prior to December 4, 2003, a generous three-year cushion within which to comply with the Receipt Provision.

20.     As for entities first putting cash registers or other machines that printed electronic receipts into use on or after January 1, 2005, FACTA gave them a generous one year cushion with which to comply with the Receipt Provision.

21.     Notwithstanding that Defendants had over ten years to comply, Defendants continued to issue receipts at the point of sale transactions which contain more than the last 5 digits from the credit card account number, in direct violation of the Receipt Provision.

22.     Notwithstanding the Receipt Provision, Defendants continue to deliberately, willfully, intentionally, recklessly, and negligently violate FACTA by issuing receipts that do not comply with the FCRA.

23.     Defendants' practice not only violates the law, it exacts harm by exposing consumers' sensitive account information and subjecting each affected consumer to an ongoing and elevated risk of becoming the victim of identity theft.

24.     The Defendants' practices arose despite the fact that, annually, Smithsonian's operations are subject to not one -- but two – audits.  First, "at least annually, … [Smithsonian's Office of the Inspector General] conduct[s] an analysis to identify high-risk areas for review to provide assurance that the Institution's programs and operations are working efficiently and effectively" – this audit is performed in accordance with the Generally Accepted Government Auditing Standards (GAGAS), which are issued by the Comptroller General of the United States. *See https://www.si.edu/OIG/Audits.*   Additionally, outside auditor KPMG has annually audited the financial statements of the Smithsonian. *E.g.,* https://www.si.edu/Content/Pdf/About/FY2014_SI_Audited_Financial_Statements.pdf.

25.     Notwithstanding this auditing regime, Defendants' conduct with regard to how it handles consumer transactions and personally identifiable information each has been found to be lacking and, all to frequently, not adequately remedied.  For instance:

a.      In 2011, Smithsonian's Inspector General – responding to a wide-scale theft of cash admissions receipts at one of its museums – conducted a review to analyze the weaknesses in the museum's internal controls.  It found that the museum did not timely detect the theft due to an organizational restructuring, a lack of written procedures within the museum's Operations Department, and inadequate procedures within the Finance Department.

b.      In 2013, Smithsonian's Inspector General alerted the Institution's Board of Regents that among its "top management challenges" for the year was that,

> The Smithsonian faces several information security challenges in balancing public access with essential information systems safeguards. The information security challenges are evident in the Smithsonian's ongoing efforts to (a) comply with government and industry standards for protecting information systems, and (b) establish an effective privacy program that will protect sensitive personally identifiable information (PII).

This is precisely – verbatim – the warning Smithsonian's inspector general identified as a "top management challenge" a year earlier, in its 2012 report.  Notwithstanding, in 2016, an outside auditor reviewing Smithsonian's institutional privacy program concluded (and notified Smithsonian) that despite implementing a new privacy policy in 2014, "significant work is still needed to institute key privacy practices and controls[,]" including "developing an organization-wide privacy strategic plan and documenting a comprehensive list of personally identifiable information being collected, processed, and stored throughout the Smithsonian."  The report further concluded that, "[w]ithout a clear

understanding of the types of personally identifiable information being handled, management officials do not have reasonable assurance that they are collecting only the information needed to carry out the Smithsonian's mission and are adequately protecting that information from unauthorized use or disclosure." Among the specific issues the auditor found:

i.   As of the 2016 report, the Smithsonian Privacy Office had not developed a formal strategic privacy plan to guide the organization through the process of identifying privacy risks and defining how it will develop and implement privacy policies, procedures, and practices to minimize those identified risks. This, the audit found, is in contrast to a key National Institute of Standards and Technology ("NIST") publication, *Security and Privacy Controls for Federal Information Systems and Organization*, which recommends that agencies have a strategic privacy plan for implementing applicable privacy controls, policies, and procedures as well as update it at least biennially. Such a strategic privacy plan should lay out the vision for how Smithsonian would protect the privacy of its employees, visitors, and volunteers.

ii.   As of the 2016 report, the Smithsonian Privacy Office had not developed a comprehensive inventory of the PII it has collected, processed, and stored in both electronic and hard-copy formats. This is in contrast to the NIST publication*, Inventory of Personally Identifiable Information*. which recommends that management

establish, maintain, and update an inventory of all programs and information systems identified as collecting, using, maintaining, or sharing PII.

iii. As of the 2016 report, Smithsonian also lacked controls to ensure that it identifies and minimizes its collection, processing, and storage of PII – notwithstanding that reducing holdings of PII is a best practice recommended by both NIST (*Minimization of Personally Identifiable Information*) and the U.S., Office of Management and Budget (*Safeguarding Against and Responding to the Breach of Personally Identifiable Information*).

iv. As of the 2016 report, Smithsonian had not conducted a comprehensive review to ascertain all locations within the Smithsonian where PII, in both electronic and hard-copy format, is being handled.    Additionally, without a complete understanding of PII in use at Smithsonian, including what the PII is used for, where it comes from, what format it is in, and how it is secured, the report found that Smithsonian cannot effectively determine where it can reduce the collection of PII – as NIST and the OMB recommend.

v. As of the 2016 report, Smithsonian had not made it a high priority to create an inventory of PII or develop a plan to reduce PII holdings.  Accordingly, the likelihood increases that PII has

not been identified and adequate controls over the PII are not in place.

vi. As of the 2016 report, Smithsonian did not have adequate controls in place to ensure privacy impact assessments (PIA) are completed for Smithsonian information systems containing PII. (The objective of the PIA is to identify systematically the risks and potential effects of collecting, maintaining, and disseminating PII and to examine and evaluate alternative processes for handling information to mitigate potential privacy risks.)

vii. As of the 2016 report, Smithsonian did not have adequate controls to ensure all personnel receive appropriate privacy training.

viii. As of the 2016 report, Smithsonian lacked controls to ensure that it periodically reviews and updates its privacy policy. The report found that Smithsonian Directive 119, *Breach Notification Policy*, had not been reviewed and updated since 2010.  This is in contrast to key NIST guidance, its *Governance and Privacy Program*, which recommends that an organization update its privacy plan, policies, and procedures at least biennially. It also violates Smithsonian policy, which requires a review and update of directives for currency every three years.  Additionally, even though privacy incidents had occurred at the Smithsonian within the last fiscal

year, management had not reviewed the effectiveness of the breach notification policy.

c.    These findings of failures with regard to the handling of personally identifiable information in 2012, 2013 and 2016 are not new to Defendant Smithsonian.  For instance, in the years immediately following the enactment of FACTA:

i.    In 2009, Smithsonian's Office of Inspector General concluded, "The Smithsonian needs to significantly improve its policies, procedures, and practices related to the identification, collection, processing, and safeguarding of sensitive personally identifiable information (PII). While the Smithsonian has addressed limited privacy considerations, the measures it has taken are generally limited in scope, decentralized, and ultimately ineffective[,]" including:

o    Smithsonian had not defined the responsibilities of the Senior Agency Official for Privacy (SAOP) to develop and implement a privacy program. The SAOP was to be someone who has competencies in the legal, security, and compliance aspects of privacy and, through hands-on involvement, be able to enforce policy.

o    Smithsonian had not developed, documented, and implemented privacy policies and procedures for the identification, collection, use, storage, disclosure, on safeguarding of sensitive PII.

o       Not all Smithsonian employees and contractors with access to PII understood privacy risks and their responsibilities for appropriately safeguarding PII.

o       Smithsonian had not formalized procedures for conducting privacy impact assessments ("PIAs") – which is an analysis of how personally identifiable information is collected, used, shared, and maintained.  Management acknowledged that, due to a backlog, it had not posted many completed PIAs on the Smithsonian web site.

o       Management did not ensure that physical controls over sensitive PII were in place.

The OIG concluded that, "without taking these actions the Institution leaves itself vulnerable to unnecessary or excessive privacy-related risks, such as that sensitive PII will be inappropriately collected, processed, or stored."

ii.     In 2004 – the year the FACTA Receipt Provision was to be implemented – Smithsonian's Office of Inspector General concurred with an outside examiner's conclusion that, at least at Smithsonian's National Museum of Natural History and at its National Museum of American History, "information systems are vulnerable to unauthorized access and the integrity of its data could be compromised."

iii. In 2003, Smithsonian's Office of Inspector General concurred with an outside examiner's conclusion that, at Smithsonian's National Air and

Space Museum (the location of the Heuer incident), "The lack of clear system administrative responsibilities puts NASM system resources at risk to unauthorized, undetected access, and alteration."

**B.      The Experience of the Named Plaintiff Neil Heuer**

26.      On or about April 9, 2015, Plaintiff visited a Smithsonian IMAX theater in the District of Columbia and purchased eight tickets to view a movie playing at the Smithsonian museum for personal use by credit card.

27.      To pay for the IMAX movie tickets, Plaintiff used his credit card.

28.      Following the transaction, Plaintiff received an electronically printed receipt at the point of sale captioned "**SALES RECEIPT**[,]" which included: (a) his name ("Neil Heuer"); (b) the written description of the credit card he used ("AMEX"); (c) the first four digits of his credit card number; and (4) the last four digits of his credit card number;

29.      At all times pertinent hereto, Defendants were acting by and through its agents, servants and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of Defendants herein.

30.      At all times pertinent hereto, the conduct of the Defendants, as well as that of their agents, servants and/or employees, was willful, reckless, and in grossly negligent disregard for federal laws and the substantive privacy rights of the Plaintiff herein.  For, given the many years Defendants had to set up a point of sale system that complies, the volume of credit and debit card transactions it likely makes each year, the gross extent to which the receipts fall outside the truncation requirements of the Receipt Provision (*i.e.,* including consumer name, name of credit card, *and* the first four digits), and the extent of purported oversight, Defendants' conduct in light of the statute is objectively unreasonable.

## V.    CLASS ACTION ALLEGATIONS

31.    Plaintiff brings this action individually and as a Class Action for Defendant's violation of section 1681c(g) of the FCRA, pursuant to Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure, on behalf of the following Class:

> All persons in the United States to whom, between January 24, 2015 and continuing through the resolution of this case, Defendants at any of its IMAX theaters, retail stores, zoo, planetarium or other locations, provided an electronically printed receipt at the point of sale or transaction on which Defendants printed more than the last five digits of the person's credit card or debit card number.

32.    The Class as defined above is identifiable.  The Named Plaintiff is a member of the Class.

33.    The Class consists, to Named Plaintiff's information and belief, of thousands of individuals, and is thus so numerous that joinder of all members is clearly impracticable. Specifically, Smithsonian reported that in Fiscal Year ("FY") 2014, all of its various institutions received 26.8 million visitors, including 7.05 million to its Museum of Natural History.  *See* Smithsonian Fiscal Year 2016 Budget Request to the Committees on Appropriations, Congress of the United States.  For FY 2015, Smithsonian estimated that it would collect $82,000,000.00 in "General Trust Funds" revenue, the sources of which include:

> net proceeds from the museum shops, catalogues, and food service concessions; sales of Smithsonian books, records, and other products based on designs and objects in the collections; theater/planetarium operations at the National Air and Space Museum and the Samuel C. Johnson IMAX Theater in the National Museum of Natural History; … ; membership programs (including subscriptions to Smithsonian and Air and Space magazines); the sale of posters, exhibition brochures, catalogues, 270 and other publications; and admission fees.

*Id.*  On information and belief, all of these revenue sources could have been points of generating the FACTA-violating credit and debit card receipts.

34.     There are questions of law and fact that are not only common to the Class, but which predominate over any questions affecting only individual Class members.   The predominating questions include, but are not limited to:

(a)     whether the Defendants willfully, knowingly or recklessly violated section 1681c(g) of the FCRA by failing to provide consumers, who used their credit and debit cards in point of sale transaction(s) with Defendants, with electronically printed receipts that complied with the Receipt Provision;

(b)     whether the Defendants willfully, knowingly or recklessly violated section 1681c(g) of the FCRA by putting cash registers and or other Devices into place on or after January 1, 2005, that electronically printed receipts at the point of sale that failed to comply with the Receipt Provision;

(c)     whether the Defendants and its agents should be enjoined from further engaging in such improper conduct; and

(d)     the proper measure of statutory damages.

35.     Plaintiff's claims are typical of the claims of the Class, which are all based on and arise out of identical facts constituting the wrongful conduct of Defendants.

36.     Plaintiff will fairly and adequately protect the interests of the Class.   Plaintiff is committed to vigorously litigating this matter.   Further, Plaintiff has secured counsel experienced in handling consumer class actions and complex consumer litigation.

37.     Neither Plaintiff nor his counsel has any interests that might cause them not to vigorously pursue this claim.

38.     This action should be maintained as a class action because the prosecution of separate actions by individual members of the Class would create a risk of establishing inconsistent or varying standards of conduct for Defendants.

39.     This action should be maintained as a class action because the prosecution of separate actions by individual members of the Class would create a risk of establishing inconsistent adjudications with respect to individual members which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

40.     Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

41.     Common questions of law and fact enumerated above predominate over questions affecting only individual members of the Class.  For instance, whether Defendants failed to comply with the Receipt Provision as detailed by 15 U.S.C. § 1681c(g), can be easily determined by a review of Defendants' policies and a ministerial inspection of Defendants' business records.

42.     A class action is a superior method for the fair and efficient adjudication of this controversy.  The interest of Class members in individually controlling the prosecution of separate claims against Defendants is small as the maximum statutory damages are limited to $1,000.00 under the FCRA.  The likelihood that individual members of the Class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.

43.     Management of the Class claims is likely to present significantly fewer difficulties than those presented in many individual claims.  The identities of the Class members may be obtained from Defendants' records.

44.     To Plaintiff's knowledge, no other FACTA litigation against Defendants is currently pending by other members of the Class.

## VI.     COUNT ONE – FCRA

45.     Plaintiff incorporates the foregoing paragraphs 1 through 40 as though the same were set forth at length herein.

46.     Title 15 U.S.C. §1681c(g) states as follows:

> Except as otherwise provided in this subsection, no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of sale or transaction.

This section applies to any "device that electronically prints receipts" (hereafter "Devices") for point of sale transactions. 15 U.S.C. §1681c(g)(3).

47.     Defendants employ the use of said Devices for point of sale transactions at each of its IMAX theaters, retail stores, zoo, and planetarium, among others.

48.     On or after January 24, 2015, at Defendants' locations, Plaintiff and members of the Class were provided receipt(s) by Defendants that failed to comply with the Receipt Provision.

49.     On April 9, 2015, Plaintiff purchased tickets to watch a movie in the IMAX theater and entrance into the planetarium at the National Air and Space Museum using a credit card.

50.     Defendants issued a receipt to Plaintiff on April 9, 2015, that included Plaintiff's first four digits and last four digits of his credit card, identified the brand of credit card and included his full name. The printing of this receipt resulted in injury to Plaintiff as it violated

Plaintiff's substantive privacy right and right to receive an electronic receipt with truncated credit card information as established under FACTA.

51.     Defendants were aware, before January 24, 2015, that the Receipt Provision had gone into effect and that it was required to make changes to its receipt delivery protocol as set forth in FACTA.

52.     In anticipation of the January 1, 2005, and December 4, 2006, deadlines set out in FACTA, many credit card companies, including but not limited to VISA, MasterCard, American Express and Discover Card, advised Defendants of the need for compliance with the Receipt Provision.

53.     Additionally, credit card processing companies routinely provided notice to Defendants in order to help implement policies well in advance of the January 1, 2005, and December 4, 2006, deadlines, to ensure the compliance with the Receipt Provision, by themselves, as well as that of Defendants.

54.     Also in anticipation of the January 1, 2005, and December 4, 2006, deadlines in the Receipt Provision, various trade groups and associations provided information related to the Receipt Provision to Defendants.

55.     The majority of Defendants' peers and competitors took the necessary steps to bring their business practices in line with FACTA many years ago.

56.     The USA and Smithsonian cannot deny that they had no knowledge of these laws.

57.     Notwithstanding FACTA's grace period to prepare for FACTA and its accompanying provisions (including but not limited to the Receipt Provision), knowledge of the Receipt Provision and FACTA as a whole, the repeated reminders of FACTA and its accompanying provisions, the actions of Defendants peers and competitors, and an additional ten

years to come into compliance with FACTA's Receipt Provision, Defendants knowingly, willfully, intentionally, and recklessly violated and continues to violate the FCRA and the Receipt Provision.

58.     In turn, Defendants have violated the substantive right to privacy of Plaintiff and members of the Class who continue to be exposed to an elevated risk of identity theft, which is an identifiable injury incurred by Plaintiff and members of the Class.

59.     As a result of Defendants' willful violations of the FCRA, Defendants are liable to Plaintiff and members of the Class pursuant to 15 U.S.C. § 1681n.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks judgment in favor of himself and the Class for the following relief:

(a)     An order certifying the proposed Class under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiff and his counsel to represent the Class;

(b)     Statutory damages for willful violation of the FCRA in an amount between $100.00 and $1,000.00 per Class member pursuant to 15 U.S.C. § 1681n;

(c)     Punitive damages for willful violation of the FCRA in an amount determined by the Court pursuant to 15 U.S.C. § 1681n;

(d)     Costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1681n;

(e)     An order enjoining Defendants from continuing to violate the Receipt Provision;

(f)     An order directing Defendants to hereafter electronically print receipts from point of sales transactions in compliance with 15 U.S.C. § 1681c(g); and

(g)     Such other and further relief as may be necessary, just and proper.

## VIII.   JURY TRIAL DEMAND

Plaintiff demands trial by jury on all issues so triable.

Respectfully,

Dated: January 23, 2017

Russell D. Duncan, Esq.
USDC-DC Bar ID # 366888
rduncan@shulmanrogers.com
Joel D. Schwartz, Esq.
USDC-DC Bar ID # 465838
jschwartz@shulmanrogers.com
Shulman, Rogers, Gandal, Pordy & Ecker, P.A.
12505 Park Potomac Avenue; 6th Floor
Potomac, MD 20854
(301) 230-5200


Cory L. Zajdel, Esq. (*pro hac vice* to be filed)
Z Law, LLC
2345 York Road, Suite #B-13
Timonium, Maryland 21093
(443) 213-1977
clz@zlawmaryland.com

**Attorneys for Plaintiff Neil H. Heuer**