### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| **NEIL H. HEUER,** | ) |
|  | ) |
| **Plaintiff,** | ) |
|  | ) |
| **v.** | ) |
|  | )    **Case No. 17-cv-0147 (TSC)** |
| **SMITHSONIAN INSTITUTION, et al.** | ) |
|  | ) |
| **Defendants.** | ) |

_____)

### <u>DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT</u>

Defendants, Smithsonian Institution and United States of America, by undersigned counsel, respectfully move to dismiss the Amended Complaint under Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.   The grounds for this motion are set forth more fully in the accompanying supporting memorandum.

Respectfully submitted,

JESSIE K. LIU, D.C. Bar #472845
United States Attorney

DANIEL F. VAN HORN, D.C. Bar #924092
Chief, Civil Division

By:   ___/s/_____
JEREMY S. SIMON
DC BAR # 447956
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
Tel: (202) 252-2528
Jeremy.Simon@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                          )
**NEIL H. HEUER,**                                )
                                                          )
               **Plaintiff,**                         )
                                                          )
        **v.**                                           )
                                                          )     **Case No. 17-cv-0147 (TSC)**
**SMITHSONIAN INSTITUTION, et al.**    )
                                                          )
               **Defendants.**                      )
_____)

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT

Defendants, by and through undersigned counsel, move pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss the Complaint.[1]  Defendants move to dismiss the complaint for lack of jurisdiction because sovereign immunity has not been waived under the Fair Credit Reporting Act ("FCRA"), and thus likewise has not been waived with respect to Plaintiff's claim under the Fair and Accurate Credit Transactions Act ("FACTA"), which is an amendment to FCRA.   Additionally, Plaintiff, who has not plausibly alleged harm or an increased risk of harm resulting from the alleged violation, lacks standing to sue based solely on an alleged technical violation of FACTA.   In addition, to the extent Plaintiff's claim is for injunctive relief, any such claim also should be dismissed for the additional reason that Plaintiff has failed to plausibly plead

---

[1]       Although four defendants are listed on the docket, only two defendants are named in the Complaint:   Smithsonian Institution and United States of America.   The other two entities listed on the docket appear on the Complaint under the heading "Serve On."   They are not identified either in the caption or in the body of the Complaint as parties.   Accordingly, undersigned counsel has entered an appearance only on behalf of the two named parties.   Out of an abundance of caution, however, this motion is being filed on behalf of all federal government defendants identified on the docket.

that the Smithsonian Institution is currently issuing credit card receipts in sales transactions that are inconsistent with the requirements of FACTA.

## BACKGROUND

Plaintiff has filed a putative class action complaint alleging violations of FACTA, 15 U.S.C. § 1681c(g), specifically, what he refers to as the "receipt provision." This section of FACTA prohibits "persons" that accept credit or debit cards for the transaction of business from printing more than the last five digits of the card number or the expiration date on any receipt provided to the cardholder at the point of sale or transaction.

Plaintiff alleges that he used his American Express credit card to pay for IMAX movie tickets at the Smithsonian's National Air & Space Museum on April 9, 2015, and that he received a sales receipt that included the first four and last four digits of his credit card number. (Am. Compl. ¶¶ 26-29) Plaintiff does not contend that the inclusion of these additional digits on his receipt resulted in any actual harm to him. (*Id.* ¶¶ 26-36) Although the Complaint alleges generally that members of the putative class were provided receipts after January 24, 2015 that "failed to comply with the Receipt Provision" of FCRA (*id.* ¶ 54), the only specific transaction alleged in the Complaint is Plaintiff's purchase of movie tickets on April 9, 2015. (*Id.* ¶¶ 26, 55-56). Plaintiff does not allege that he was issued an allegedly non-compliant credit card receipt in connection with any other transaction with the Smithsonian or other federal entity.

Violations of FACTA's redaction requirements are subject to the "two-tier" damages structure of the FCRA. Statutory damages of $100 to $1,000 per violation (plus possible punitive damages and attorneys' fees) may be awarded for "willful" violations. 15 U.S.C. § 1681n(a). However, if the violation is found to be negligent instead of willful, then only actual damages and

attorneys' fees may be awarded.   15 U.S.C. § 1681o.   The complaint alleges willful violations of

FACTA and seeks damages only under section 1681n.   (Am. Compl. ¶ 66 and at page 18)

## ARGUMENT

### I.   Standard of Review

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) "presents a threshold

challenge to the Court's jurisdiction," and thus "the Court is obligated to determine whether it has

subject-matter jurisdiction in the first instance."   *Curran v. Holder*, 626 F. Supp. 2d 30, 32

(D.D.C. 2009) (internal citation and quotation marks omitted).   "[I]t is presumed that a cause lies

outside [the federal courts'] limited jurisdiction," *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511

U.S. 375, 377 (1994), unless the plaintiff can establish by a preponderance of the evidence that the

Court possesses jurisdiction.   *See, e.g.*, *U.S. ex rel. Digital Healthcare, Inc. v. Affiliated

Computer*, 778 F. Supp. 2d 37, 43 (D.D.C. 2011) (citing *Hollingsworth v. Duff*, 444 F. Supp. 2d

61, 63 (D.D.C. 2006)).   Thus, the "'plaintiff's factual allegations in the complaint . . . will bear

closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to

state a claim.'" *Id.* (quoting *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp.

2d 9, 13-14 (D.D.C. 2001) (internal citation and quotation marks omitted)).

More specifically, a Rule 12(b)(1) motion to dismiss for lack of jurisdiction may be

presented as either a facial or factual challenge.   *Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192,

197 (D.C. Cir. 1992) (a district court may "dispose of a motion to dismiss for lack of subject matter

jurisdiction . . . on the complaint standing alone" or "may consider the complaint supplemented by

undisputed facts").   "A facial challenge attacks the factual allegations of the complaint that are

contained on the face of the complaint, while a factual challenge is addressed to the underlying

facts contained in the complaint." *Al-Owhali v. Ashcroft*, 279 F. Supp. 2d 13, 20 (D.D.C. 2003) (internal quotations and citations omitted). When a defendant makes a facial challenge, the district court must accept the allegations contained in the complaint as true and consider the factual allegations in the light most favorable to the non-moving party. *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993); *see also Erby v. United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006). With respect to a factual challenge, the district court may consider materials outside of the pleadings to determine whether it has subject matter jurisdiction over the claims. *Jerome Stevens Pharmacy, Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005). The plaintiff bears the burden of establishing the factual predicates of jurisdiction by a preponderance of evidence. *Erby*, 424 F. Supp. 2d at 182.

When considering a motion to dismiss under Rule 12(b)(6), courts are bound to construe a complaint liberally in the plaintiff's favor, and should grant the plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Nevertheless, courts need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the courts accept plaintiff's legal conclusions. *Grant v. Entm't Cruises, Inc.*, 282 F. Supp. 3d 114, 117 (D.D.C. 2017); *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

Additionally, a complaint "'must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave–Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002) (internal citations omitted). In other words, a plaintiff must put forth "factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Anthony v. Int'l Ass'n of Machinists & Aerospace Workers Dist. Lodge 1*, 296 F. Supp. 3d 92, 95 (D.D.C. 2017).

## II. Plaintiff's Claim Is Barred By Sovereign Immunity

### A.  Sovereign Immunity Must Be Unequivocally and Expressly Waived

"Sovereign immunity shields the United States from suit absent a consent to be sued that is 'unequivocally expressed.'" *United States v. Bormes*, 133 S. Ct. 12, 16 (2012) (citing *United States v. Nordic Village, Inc.*, 503 U.S. 30, 33-34 (1992)); *FDIC v. Meyer*, 510 U.S. 471, 475 (1994); *U.S. Dep't of Energy v. Ohio*, 503 U.S. 607, 615 (1992); *United States v. Mitchell*, 463 U.S. 206, 212 (1983); *United States v. Sherwood*, 312 U.S. 584, 586 (1941). A statute waiving the sovereign immunity of the United States must be construed strictly in favor of the retention of sovereign immunity. *Library of Congress v. Shaw*, 478 U.S. 310, 318 (1986); *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 685-686 (1983).   Indeed, such a waiver is to be read no more broadly than its terms require. *Ruckelshaus*, 463 U.S. at 685.

The two named Defendants in this action are the United States and the Smithsonian (*supra* note 1). As alleged in the Complaint, the Smithsonian is "a trust instrumentality of the United States of America which owns and operates IMAX theaters."  (Am. Compl. ¶ 10)  Without deciding the issue, the D.C. Circuit has noted "[s]everal elements of the Smithsonian's congressional design" suggesting "that it does have sovereign immunity." *Forman v. Small*, 271 F.3d 285, 295 (D.C. Cir. 2001). Specifically, the Smithsonian operates under a federal charter, 20 U.S.C. §§ 41 et seq., its Board of Regents is composed of or selected by federal officials, and its funding (*i.e.,* it is authorized to receive appropriations from Congress and disbursements for payments of debt are submitted to the Treasury) "would suggest that Congress's interest in

safeguarding the public fisc from money judgments is no less significant with respect to the Smithsonian than any federal agency." *Id.* (assuming, without deciding, that the Smithsonian is entitled to sovereign immunity); *Voyles v. Smithkline Beecham Corp. (In re Collins)*, 524 F.3d 249, 252 n.2 (D.C. Cir. 2008) (citing *Forman*); *see also Misra v. Smithsonian Astrophysical Observatory*, 248 F.3d 37, 39 (1st Cir. 2001) ("The Smithsonian . . . enjoys sovereign immunity from suit.").

Similarly, in *Expeditions Unlimited Aquatic Enterprises, Inc. v. Smithsonian*, 566 F. 2d 289 (D.C. Cir. 1977), the D.C. Circuit, while not reaching the issue of the Institution's immunity status at common law, held that the Federal Tort Claims Act applied to the Smithsonian as a whole (*i.e.*, to the torts attributable to either its civil service or trust employees) because it was within the definition of "independent establishments of the United States," thus allowing the Smithsonian to share in the immunities of the United States in a suit for libel. *Id* at 296. *See also O'Rourke v. Smithsonian Inst. Press*, 399 F.3d 113, 119 (2d Cir. 2005) (Smithsonian Institution is "the United States" for purposes of 28 U.S.C. Section 1498(b), which vests exclusive jurisdiction over copyright claims against "the United States" in the Court of Federal Claims). The D.C. Circuit, moreover, recently affirmed a decision by this Court dismissing an action asserting constitutional tort claims against the Smithsonian on the basis that the "Smithsonian Institution . . . [is] entitled to sovereign immunity unless that immunity is waived by the Federal Tort Claims Act." *Beck v. United States,* Case No. 18-5253, 2019 U.S. App. LEXIS 27947, at *1 (D.C. Cir. Sept. 17, 2019). Accordingly, as a threshold matter, this action cannot proceed against either Defendant unless sovereign immunity has been waived.

**B.   The Fair Credit Reporting Act Does Not Unequivocally Waive Sovereign Immunity.**

FCRA imposes actual damages, statutory damages, punitive damages, and criminal liability on "person[s]," and allows both state governments and federal agencies to sue "person[s]" under FCRA. 15 U.S.C. §§ 1681n, 1681o, 1681q, 1681s(a), (b), (c). The threshold issue in this case is whether Congress waived the immunity of the United States by amending the remedial provisions of the Act (sections 1681n and 1681o) to include the term "persons", which is a term broadly defined in section 1681a(b) to include "any individual, partnership, corporation, trust, estate, cooperative, association, government or governmental subdivision or agency, or other entity." For reasons discussed below, the history of FCRA and the statutory context establish that sovereign immunity was not unequivocally waived by this amendment. Accordingly, the Complaint should be dismissed as to both the United States and the Smithsonian.

**1.   History of The Fair Credit Reporting Act**

Congress enacted FCRA in 1970 "to promote efficiency in the Nation's banking system and to protect consumer privacy" by "requiring credit reporting agencies to maintain 'reasonable procedures' designed 'to assure maximum possible accuracy of the information' contained in the credit reports." *TRW Inc. Andrews*, 534 U.S. 19, 23 (2001); *Saunders v. Branch Banking & Trust Co*., 526 F.3d 142, 147 (4th Cir. 2008) (citing *Safeco Ins. Co. of Am. v. Burr*, 127 S. Ct. 2201, 2205-06, (2007)). As originally enacted in 1970, FCRA principally regulated "consumer reporting agenc[ies,]" entities that aggregate and disseminate personal information about consumers used to determine eligibility for credit, insurance, and other purposes. 15 U.S.C.

§ 1681a(d), (f). At that time, the statute's remedial provisions, sections 1681n and 1681o, applied not to "persons" but only to consumer-reporting agencies. *Robinson v. Pennsylvania Higher Educ. Assistance Agency,* 2017 U.S. Dist LEXIS 51678, at \*7 (D. Md. Apr. 3, 2017). Thus, although the 1970 statute defined the term "person" to include "any individual, partnership, corporation, trust, estate, cooperative, association, government or governmental subdivision or agency, or other entity," 15 U.S.C. § 1681a(b), the inclusion of the terms "government or governmental subdivision or agency" in that definition had no bearing on the liability of the United States for private civil suits because the 1970 statute imposed no such liability on an entity by virtue of being a "person." *Robinson,* 2017 U.S. Dist. LEXIS at \*7-8.

The Consumer Credit Reporting Reform Act of 1996 expanded FCRA's scope beyond its original focus on consumer reporting agencies to regulate persons who furnish information to consumer-reporting agencies and persons who use credit reports. *See* Pub. L. No. 104-208, §§ 2403, 2411, 110 Stat. 3009, 3009-430-31, 3009-443-46. Congress amended 15 U.S.C. §§ 1681n and 1681o to permit damages against "[a]ny person." 15 U.S.C. §§ 1681n, 1681o; Pub. L. No. 104-208 § 2412(a) (d). Those changes substituted the phrase "[a]ny person who" for "[a]ny consumer reporting agency or user of information which" in section 1681n and 1681o. *See* 15 U.S.C. § 1681n (statutory and punitive damages for willful noncompliance); *id*. § 1681o (actual damages for negligent noncompliance). The definition of "person" in the Act remained as originally contained in the Act, however. Plaintiff thus seems to allege, by virtue of the incorporation of the term "person" into these sections, that the Congress effected an unequivocal waiver of sovereign immunity by this Amendment.

**2. There is No Clear Congressional Expression or Intent to Waive Sovereign Immunity under the Fair Credit Reporting Act**

While the definition of "person" remained unchanged after the 1996 Amendment, there is no indication that Congress intentionally sought to subject the United States to monetary damages. Neither the D.C. Circuit nor the Supreme Court has ruled on whether the FCRA waives sovereign immunity. However, the Supreme Court has held that courts must "presume congressional familiarity" with the "common rule" that "any waiver of the Government's sovereign immunity must be unequivocal." *Department of Energy v. Ohio*, 503 U.S. 607, 615 (1992) (citations omitted).[2]   This clear textual waiver rule "ensures that Congress has specifically considered . . . sovereign immunity and has intentionally legislated on the matter," *Sossamon v. Texas,* 563 U.S. 277, 290 (2011), and "ensure[s] Congress does not, by broad or general language, legislate on a sensitive topic inadvertently or without due deliberation." *Id.* at 291.   It is therefore well settled that "[a]ny ambiguities in the statutory language are to be construed in favor of immunity." *FAA v. Cooper,* 566 U.S. 284, 290 (2012).

Although statutory definitions typically control the meaning of statutory words, there are exceptions, such as when doing so would "create obvious incongruities in the language" or create "constitutional concerns." *Lawson v. Suwannee Fruit & S.S. Co.*, 336 U.S. 198, 201 (1949) (holding that the term "disability" was not used as a term of art in the statute, despite the term being defined therein); *Northwest Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 206-207 (2009) ("statutory definition . . . does not apply to every use of the term 'political subdivision'

---

[2]       The Supreme Court also has made clear that Courts may only look to FCRA "to determine whether Congress intended to subject the United States to damages liability." *United States v. Bormes*, 133 S. Ct. 12, 20 (2012) (rejecting claim that the Little Tucker Act authorized FCRA damages against the United States).

of the Act").   The Supreme Court recognized this principle, for instance, in *King v. Burwell*, 135 S. Ct. 2480 (2015), when it explained that "when deciding whether the language [in a statute] is plain, we must read the words 'in their context and with a view to their place in the overall statutory scheme.'"   *Id.* at 2489.   There, the Court interpreted the term "Exchange established by the State" as encompassing federal exchanges even though the term "State" was defined in the Affordable Care Act as 'each of the 50 States and the District of Columbia' – a definition that seemingly excluded the Federal Government."   *King,* 135 S. Ct. at 2490.   The Court explained that "when read in context, 'with a view to [its] place in the overall statutory scheme,' the meaning of the phrase 'established by the State' is not so clear."   *Id.*

When the parties originally briefed this issue in response to the original Complaint, numerous district courts had held that FCRA does not unequivocally waive the United States' sovereign immunity,[3] although there were a few district court cases to the contrary.[4]   Since that time, the Fourth and Ninth Circuit have had occasion to address the issue and both have held that FCRA's text and structure make clear that no unambiguous and unequivocal waiver of sovereign

---

[3]      *See, e.g., Daniel v. National Park Service,* 2016 U.S. Dist. LEXIS 109199, at *11 (D. Mont. Aug. 17, 2016); *Echols v. Morpho Detection, Inc.,* 2013 U.S. Dist. LEXIS 27911, at *12-13 (N.D. Cal. Feb. 27, 2013); *Stellick v. United States Dep't of Educ.*, 2013 U.S. Dist. LEXIS 25058, at *14 (D. Minn. Feb. 25, 2013); T*aylor v. United States*, 2011 U.S. Dist. LEXIS 56797, at *15 (D. Ariz. May 16, 2011); *Gillert v. United States Dep't of Educ.*, 2010 U.S. Dist. LEXIS 93035, at *8 (W.D. Ark. Sept. 7, 2010); *Ralph v. U.S. Air Force MGIB*, 2007 U.S. Dist. LEXIS 100089, at *6 (D. Colo. Oct. 2, 2007); *Kenney v. Barnhart*, 2006 U.S. Dist. LEXIS 51068, at *29 (C.D. Cal. July 26, 2006); *Robinson v. Pennsylvania Higher Educ. Assist. Agency,* 2017 U.S. Dist. LEXIS 51678 (D. Md. Apr. 3, 2017).

[4]      *See, e.g., Owner-Operator Indep. Drivers Ass'n v. Fox,* 2015 U.S. Dist. LEXIS 193774, at *13 n.3 (D.D.C. Mar. 10, 2015) (finding waiver of sovereign immunity, citing *Bormes v. United States*, 759 F.3d 793 (7th Cir. 2014)); *Mooneyham v. Equifax Info. Services,* 99 F. Supp. 3d 720, 726 (W.D. Ky. 2015) (same).

immunity has taken place.   *Robinson v. Department of Educ.,* 917 F.3d 799, 806 (4th Cir. 2019);

*Daniel v. Nat'l Park Serv.,* 891 F.3d 762, 768-74 (9thCir. 2018) (observing the myriad absurd

results of reading "person" to include the United States throughout the enforcement provisions

of the statute).   Now, in light of these decisions, the weight of authority overwhelmingly favors

the government's position that subject matter jurisdiction is lacking here.   *See also Johnson v.*

*Trans Union, LLC,* 2019 U.S. Dist. LEXIS 117821, at *12 (W.D. La. July 15, 2019) ("the Court

concludes that the FCRA does not contain a clear, unequivocal, and unambiguous waiver of

sovereign immunity," citing *Daniel* and *Robinson*); *Smith v. Pa. Higher Educ. Assistance*

*Agency,* 2019 U.S. Dist. LEXIS 118791, at *15 (E.D. Mich. July 17, 2019) (same).

　　　Both the Fourth and Ninth Circuits, moreover, rejected the Seventh Circuit's contrary

decision in *Bormes v. United States*, 759 F.3d 793 (7th Cir. 2014), on the basis that the Seventh

Circuit failed to consider several applicable legal doctrines, as well as the "befuddling" and

"bizarre" results that flowed from adopting its reading of the statute.   *Robinson,* 917 F.3d at 804

(plaintiff's "reading of the statute would raise a host of new issues ranging from the merely

befuddling to the truly bizarre. We thus follow the Supreme Court's lead in being 'especially

reluctant to read 'person' to mean the sovereign where, as here, such a reading is decidedly

awkward.'"); *Daniels,* 891 F.3d at 770 ("Distilling a clear waiver of sovereign immunity in the

FCRA would require us to treat 'the United States' as a 'person' in each provision. Substituting

the sovereign for each of the FCRA's iterations of 'person' leads to implausible results,

however[.]").   Indeed, the Seventh Circuit has recently "retreated from *Bormes* by upholding

tribal sovereign immunity under FCRA, even though federal and tribal governments equally

qualify as 'any government' [within the statutory definition of "person"] under *Bormes'* reading

11

of the statute." *Robinson,* 917 F.3d at 806 (citing *Meyers v. Oneida Tribe of Indians of Wis.*, 836 F.3d 818, 823-27 (7th Cir. 2016)).

The Fourth and Ninth Circuits based their decisions on the following basic premises: (1) the term "person" is not normally read to include the sovereign; (2) the language found in other federal statutes waiving sovereign immunity is much clearer and more explicit than that which is used in the FCRA; and (3) a reading of the enforcement provisions as a whole utilizing the plaintiffs' proposed interpretation would lead to absurd results, such as contemplating criminal prosecution of the federal government itself.  For these reasons, both the Fourth and Ninth Circuits found the absence of a "clear" and "unequivocal" waiver in the statute.  Because the discussion in *Robinson* incorporates much of the Ninth Circuit's reasoning, the analysis in *Robinson* is principally addressed below, with additional analysis by the Ninth Circuit cited as appropriate.

*Robinson* first noted a long line of cases that affirm that the word "person" ordinarily does not mean the sovereign. *Robinson,* 917 F.3d at 802 (citing *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 780 (2000) and *United States v. Cooper Corp.*, 312 U.S. 600 (1941)).  That canon, moreover, "applies even when 'person' is elsewhere defined by statute." *Robinson,* 917 F.3d at 802.  Because "the United States is not ordinarily considered to be a person," the Fourth Circuit reasoned that sovereign immunity has not been "unambiguously waived" based on the plain meaning of the term "person." *Id.* at 803.

In addition, as the Fourth Circuit observed, "statutes waiving sovereign immunity are normally quite clear." *Id.*  In that regard, the Court compared several statutes that contain unequivocal waivers of sovereign immunity (i.e., the phrase "the United States . . . is liable" or

its equivalent) with the generic use of the term "person" in the FCRA which, even as defined in the statute, "does not specifically mention the United States or the federal government." *Id.*. As the Court explained, the "stark contrasts between FCRA's civil liability provisions and recognized waivers serve as strong evidence that Congress did not waive sovereign immunity under FCRA." *Id.* at 804.

Third, in comparison to the "casual" nature of the alleged waiver (by the use of the generic term "person"), the Court noted the potential financial consequences to the government of waiving immunity under FCRA's general liability provision, as well as the myriad of "befuddling" and "truly bizarre" consequences that would flow from reading the term "person" as including the sovereign. *Id.* The Court thus followed "the Supreme Court's lead in being 'especially reluctant to read 'person' to mean the sovereign where, as here, such a reading is decidedly awkward.'" *Id.* Among other things, the Court noted that the statute's enforcement provisions also "facially authorize criminal proceedings against '[a]ny person,'" which, under the reading advanced by Plaintiff here, would contemplate the possibility "of the government bringing criminal charges against itself." *Id.*

Such a reading also "would expose 'any government' to liability, including foreign, tribal, and state governments" and thus conflict with treaties, "a history of tribal immunity," and "constitutional limits on federal abrogation of state sovereign immunity."[5]  *Id.* at 805.  The Court properly recognized that "[t]o read these broad and staggering implications into the statute

---

[5]      *See e.g. Employees of the Department of Health & Welfare v. Department of Public Health & Welfare*, 411 U.S. 279 (1973) ("Congress, acting responsibly, would not be presumed to [abrogate state sovereign immunity] silently" noting that there was "not a word in the history of the 1966 amendments to indicate a purpose of Congress" to subject States to suit in federal court.")

on the slimmest of textual hints would be to abjure our duty to construe 'the statutory language with that conservatism which is appropriate in the case of a waiver of sovereign immunity.'"   *Id.* Ultimately, "[t]he statute bears no indicia of congressional intent to bring about such a bevy of implausible results, let alone an unambiguous and unequivocal intent to do so."   *Id.*

The Court also recognized a distinction between FCRA's substantive provisions (which the government in a different case had conceded applied to it) and its enforcement provisions, which is the subject of the immunity analysis.   *Id.* at 806.   As the Court explained, that distinction "does not create a textual anomaly, but rather reflects a holistic statutory view" based on the structure of the statute prior to the 1996 Amendment.   *Id.* Indeed, the Supreme Court has warned that the "tendency to assume that a word which appears in two or more legal rules, and so in connection with more than one purpose, has and should have precisely the same scope in all of them . . . has all the tenacity of original sin and must constantly be guarded against." *Gen. Dnamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 595 n.8 (2004).   The absence of any "textual anomaly," moreover, is reflected by the Supreme Court's recognition that "Congress is free to waive the Federal Government's sovereign immunity against liability without waiving its immunity from monetary damages awards."   *Lane v. Pena*, 518 U.S. 187, 196 (1996).   Reading the statute as not unequivocally waiving immunity in the enforcement provisions (even if the government allegedly is subject to the statute's substantive provisions) is thus consistent with longstanding precedent.

Although the Fourth Circuit rested its analysis solely on the text and structure of FCRA, the Ninth Circuit in addition to that analysis observed that the legislative history also did not support a waiver of sovereign immunity.   Specifically, "[d]espite the 1996 Act's levy of

substantial potential liability on "person[s],' Congress never once mentioned exposing the federal

fisc to the same liability." *Daniel,* 891 F.3d at 775.  The absence of any such reference "is

particularly glaring given the government's role as the nation's largest employer, lender, and

creditor, and its corresponding vulnerability to suit under the new FCRA provisions." *Id.* at 776.

Thus, for all of these reasons, the Ninth Circuit concluded that "Congress 'legislate[d] on a

sensitive topic inadvertently or without due deliberation' when it used 'person'" and that "[t]he

explicit waiver rule exists to prevent such inadvertent drafting from exposing the United States

to liability." *Id.*

Because the definition of "person" was enacted in 1970, and the availability of the private

damages at issue here was added to the statute in 1996 without any clear statement of

Congressional intent to sweep the federal government within those provisions, reliance on the

statutory definition of the term "person" is not dispositive.   Instead, context and statutory history

demonstrate the absence of an express waiver of sovereign immunity for a claim of damages

under section 1681n (or section 1681o) against the federal government.

### 3.  The Seventh Circuit Analysis in *Bormes* Should be Rejected

In *Bormes v. United States*, 759 F.3d 793 (7th Cir. 2014), the Seventh Circuit held that

sovereign immunity under the FCRA was waived by virtue of the use of the term "person" in

section 1681n.  *Id.* at 795.  That decision, however, is not binding on this Court and largely

stands alone among courts that have considered this issue.

As the Fourth Circuit observed in *Robinson,* moreover, the Seventh Circuit has recently

"retreated from *Bormes* by upholding tribal sovereign immunity under FCRA, even though

federal and tribal governments equally qualify as 'any government' under *Bormes'* reading of

the statute.   *Robinson,* 917 F.3d at 806 (citing *Meyers v. Oneida Tribe of Indians of Wis.*, 836

F.3d 818, 823-27 (7th Cir. 2016)).   Reading "any government" within the definition of "person"

to allow suits against tribes, in the view of *Meyers*, would be "shoehorning" a tribal immunity

waiver where it failed utterly to fit.   *Meyers,* 836 F.3d at 827. However, as the Ninth Circuit

recognized in *Daniel*, the Seventh Circuit's logic regarding tribal sovereign immunity should

apply equally to the United States, for which a waiver is equally being "shoehorn[ed]" where it

does not fit.   *Daniel,* 891 F.3d at 774.   This Court should decline to follow *Bormes* for the same

reason it was not followed by the Fourth and Ninth Circuits, and for the following additional

reasons.

First, the Seventh Circuit erroneously assumed that because the United States allegedly

could be required under the FRCA to comply with the substantive requirements of the Act, it

necessarily must also be subjected to damages for violations of the Act. *Bormes,* 759 F.3d at 795

("If the United States is a 'person'…for the purposes of duties, how can it *not* be one for

the  purpose  of remedies?"). However, the question of remedy is distinct from the question of

statutory duty as the Supreme Court has recognized. *See Emps. of the Dep't of Pub.  Health &

Welfare* v. *Dep't of Pub. Health & Welfare,* 411 U.S. 279, 283-86 (1973) (holding that

Congress provided coverage under the Fair Labor Standards Act to state employees without

permitting state employees to sue the State for damages); *Atascadero State Hosp*. v. *Scanlon*,

473 U.S. 234, 244-46 (1985) ("The court erred, however, in concluding that because various

provisions of the Rehabilitation Act are addressed to the States, a State necessarily consents to

suit in federal court by participating in programs funded under the statute").

Second, the Seventh Circuit ignored relevant statutory history and context when it observed that "[t]he absence of legislative history discussing sovereign immunity in 1996 is hardly surprising" because "[i]mmunity had been waived in 1970." *Bormes,* 759 F.3d at 795. The 1970 definition of "person", however, did not operate as a waiver of sovereign immunity for damages against the United States because the statute, at that time, only imposed damages upon "[a]ny consumer reporting agency or user of information." *Robinson,* 2017 U.S. Dist. LEXIS 51678, at *7-8. The relevant question, therefore, is whether Congress expressed a clear intent to waive sovereign immunity when it amended FCRA's remedial provisions in 1996 to impose liability, for the first time, on "persons" generally.   The lack of legislative history in 1996 is therefore instructive and, contrary to the Seventh Circuit's analysis, is a "surprising" omission had Congress intended such a broad waiver.

Finally, the Seventh Circuit found unpersuasive the argument that an interpretation of "person" in section 1681n to include the government would run afoul of "a tradition that the United States is not subject to punitive damages." *Bormes,* 759 F.3d at 796. Although acknowledging such a tradition, the Seventh Circuit summarily rejected the argument by stating that Congress has the power to authorize punitive damages against the United States irrespective of "tradition."   *Bormes,* 759 F.3d at 796.   But that summary rejection of the argument begs the question of whether Congress would take such a non-traditional step without expressing a clear intent to do so.   Although such "historic rule[s]" can be overridden by Congress, they "provide[] 'an added gloss of strictness' upon the rule of strict construction" and a corresponding expectation that Congress would express itself clearly if its intent was to deviate from tradition. *See Brown v. Secretary of Army,* 78 F.3d 645, 651 (D.C. Cir. 1996) (characterizing the "historical

rule that interest is a separate element of damages and may be recovered only against a party that has agreed to be liable therefor" as providing "'an added gloss of strictness' upon the rule of strict construction").

Accordingly, for all of these reasons, the Court should dismiss the Complaint for lack of subject matter jurisdiction.

### III.    The Complaint Should Be Dismissed On The Alternative Ground That Plaintiff Lacks Standing

Standing is a necessary predicate to any exercise of federal jurisdiction and, when it is lacking, the dispute fails to present a concrete case or controversy under Article III.  *Ariz. Christian Sch. Tuition Org. v. Winn,* 131 S. Ct. 1436, 1442 (2011); *Dominguez v. UAL Corp.,* 666 F.3d 1359, 1361 (D.C. Cir. 2012).   To establish standing, Plaintiff must demonstrate that he suffered an injury-in-fact, specifically an injury that is "'concrete, particularized, and actual or imminent;'" that the injury is "'fairly traceable to the challenged action;'" and that it is "likely," not speculative, that the injury is "'redressable by a favorable ruling.'" *Clapper v. Amnesty Int'l,* 133 S. Ct. 1138, 1147 (2013); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992). Plaintiff bears the burden of establishing each element.  *Lujan,* 504 U.S. at 561.

Plaintiff alleges that on one occasion in April 2015 he received a credit card receipt from the Smithsonian that he contends was not compliant with the "receipt provision" of FACTA because it included the first four digits of his credit card number in addition to the last four digits. (Am. Compl. ¶¶ 26, 29).   Plaintiff does not allege that he suffered any actual harm as a result of the alleged violation and, given the passage of time since that transaction, Plaintiff cannot plausibly plead the likelihood of any imminent risk of actual harm traceable to that alleged violation.   His alleged standing to sue (and to represent a putative class) instead appears to be based entirely on

the alleged statutory violation itself.

However, in *Spokeo, Inc. v. Robins,* 136 S. Ct. 1540 (2016), the Supreme Court considered the question of standing under FACTA and held that the bare violation of the statute without alleged concrete harm is insufficient.   *Id.* at 1549.   The Court explained that a plaintiff does not "automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right."   *Id.*   Instead, "Article III standing requires a concrete injury even in the context of a statutory violation" and, "[f]or that reason, [a plaintiff] could not, for example, allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement."   *Id.*

The Court, moreover, "cautioned . . . that some statutory violations could 'result in no harm,' even if they involved producing information in a way that violated the law."   *Hancock v. Urban Outfitters, Inc.,* 830 F.3d 511, 514 (D.C. Cir. 2016) (quoting *Spokeo*, 136 S. Ct. at 1550). The Court suggested, for instance, that a "bare procedural violation" that did not "present any material risk of harm" would not satisfy the "concrete injury" requirement of Article III standing. *Spokeo*, 136 S. Ct. at 1550.   The Court offered the example of "an incorrect zip code" and opined that "[i]t is difficult to imagine how the dissemination of an incorrect zip code, without more, could work any concrete harm."   *Id.*   The Court, moreover, made "clear that the legislature 'cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing' under Article III." *Hancock,* 830 F.3d at 514 (quoting *Spokeo,* 136 S. Ct. at 1547-48).

Here, Plaintiff has alleged a bare procedural violation of FACTA that fails to present "any material risk of harm."   Plaintiff alleges that he received a receipt that, in addition to the last four

digits of his credit card number as permitted by the statute, also included the first four digits of his credit card number in violation of 15 U.S.C. § 1681c(g). He does not allege any actual harm and thus bases his claim (and that of the putative class) entirely on an alleged technical violation of the statute.   Under *Spokeo,* Plaintiff lacks standing here because he cannot demonstrate that the inclusion of the first four digits of his credit card created a material risk of the type of harm that section 1681c(g) was intended to prevent.   Several Circuits have reached the same conclusion under analogous facts.   *See, e.g., Kamal v. J. Crew Group,* 918 F.3d 102, 117 (3d Cir. 2019); *see also Katz v. Donna Karan Co. Store,* 872 F.3d 114, 120 (2d Cir. 2017) ("the first six digits . . . is the equivalent of printing the name of the issuing institution which need not be truncated under FACTA"); *Noble v. Nevada Checker Cab Corp.*, 726 Fed. Appx. 582, 584 (9th Cir. 2018) (no standing for printing digits that reveal the credit card issuer).

In *Jeffries v. Volume Services America,* No. 18-7139, 2019 U.S. App. LEXIS 19756 (D.C. Cir. July 2, 2019), the D.C. Circuit addressed the issue of standing in the context of an alleged violation of the "receipt provision" of FACTA.   Although the analysis in *Jeffries* was more involved than a straightforward application of *Spokeo* would seem to warrant,[6] its analysis (including its favorable citation to *Kamal, supra*) nonetheless leads to the conclusion that standing is lacking here.

---

[6]      The appellee in *Jeffries* unsuccessfully moved in the D.C. Circuit for rehearing *en banc* and, in a petition to stay issuance of the mandate (which was denied), indicated an intent to file petition for writ of certiorari to the Supreme Court.   Defendants will notify the Court if the Supreme Court agrees to hear that appeal.   Moreover, for purposes of preserving the issue, Defendants continue to maintain their threshold argument that a straightforward application of *Spokeo* (as opposed to the more involved analysis in *Jeffries*) is sufficient to resolve the standing issue in the government's favor.

In *Jeffries*, the Court concluded that FACTA protected a concrete interest, namely, "avoiding an increased risk of identity theft," *id.* at *7, but also that the analysis of the "concrete injury in fact" requirement "does not stop with th[at] conclusion." *Id.* at *9-10.   Instead, in the absence of actual identity theft (as is the case here), the challenged statutory violation must "create[] a 'risk of real harm'" to the protected interest, *id.* at *10, meaning that the receipt must include "'enough information to likely enable identity theft.'"   *Id.* at *14 (quoting *Kamal,* 918 F.3d at 116).

Thus, the Court expressly recognized that "not every violation of FACTA's truncation requirement creates a risk of identity theft" to qualify as a concrete injury in fact.   *Id.* at *11; *see also Hancock*, 830 F.3d at 514 (no standing where plaintiffs alleged that department store clerk violated consumer protection statute by asking for their zip codes because it "'is difficult to imagine how the dissemination of an incorrect zip code, without more, could work any concrete harm'").   Indeed, the Court agreed with decisions from other Circuits that "a FACTA violation based solely on a failure to truncate an expiration date does not qualify as a concrete injury in fact" because that type of disclosure does not increase the risk of identity theft.   *Jeffries,* 2019 U.S. App. LEXIS 19756 at *11.

And, as is relevant here, the Court also cited approvingly to the Third Circuit's decision in *Kamal,* which held that a plaintiff failed to establish standing when the receipt at issue was printed with the first six digits of the credit card number.   *Id.* at *14.   Although the Court in *Jeffries* noted that it was "not necessarily in full agreement with the Third Circuit" in terms of the applicable standard,"[7] it strongly indicated that it agreed with the result in that case.   *See id.*

---

[7]      The Court noted that it was "not necessarily in full agreement with the Third Circuit" on

21

Although indicating agreement with the result in *Kamal,* the D.C. Circuit in *Jeffries* found that decision to be distinguishable because, in contrast to *Kamal,* the facts presented in *Jeffries* reflected what the Court termed the "nightmare scenario" in which the receipt contained the *entire* credit card number and expiration date.   *Id.* at *12, 14.   As *Kamal* itself recognized, the potential for identity theft is "'significantly less conjectural'" in that "nightmare scenario."   *Jeffries,* 2019 U.S. App. LEXIS at *14-15 ("In other words, the Third Circuit recognized its analysis would be different if it were presented with the same facts Jeffries presents to us.")   Thus, given the "nightmare scenario" before it, the *Jeffries* court found that plaintiff had met the requirement of a concrete injury in fact.

The case here, however, involves a factual scenario similar to *Kamal,* and distinguishable from *Jeffries,* as Plaintiff alleges only that the first four digits of his card number (in addition to the last four digits permitted under the statute) appeared on his receipt.   He does not allege that the entire card number was disclosed.   In *Kamal,* the Third Circuit found it dispositive that the plaintiff had failed to allege that "the receipt included enough information to likely enable identity theft."   *Kamal,* 918 F.3d at 116.   Rather, as here, the complaint in *Kamal* made a generic allegation that "'identity thieves . . . obtain Card receipts that are lost or discarded . . . and use information on them to commit fraud and theft.'"   *Id.   Kamal* found those allegations – which are

---

the basis that the Third Circuit's analysis rested on a slightly more "onerous burden," *id.* at *15 n. 3, in that it "analyzed how close the plaintiff came to suffering actual identity theft" rather than "whether the alleged statutory violation increased [the plaintiff's] risk of identity theft." *Id.* Importantly, the *Jeffries* court declined to follow the Eleventh Circuit's analysis in *Muransky v. Godiva Chocolatier,* 922 F.3d 1175 (11th Cir. 2019), which rested on the notion that Congress had "'set the tolerable level of risk at printing the last five digits of a card number.'"   *Jeffries,* 2019 U.S. App. LEXIS at *10 (declining to follow the Eleventh Circuit and instead observing that "not *every* violation of FACTA's truncation requirement creates a risk of identity theft").

similar to the "dumpster diving" allegations in the Complaint here (Am. Compl. ¶ 15) – to amount to a "speculative chain of events" that "does not constitute a material risk of harm." *Id.*   For the same reason, Plaintiff here has failed to plead facts that constitute a concrete injury in fact.

In addition, as reflected in the accompanying declaration of John Duven ("Duven Decl."), the disclosure of the first four digits of Plaintiff's credit card could not have meaningfully (i.e., non-speculatively) increased the risk of identity theft because those digits do not reflect any sensitive information specific to the cardholder.   (Duven Decl. ¶ 3)   The credit card at issue here was an American Express ("Amex") card, which is embossed with a 15-digit number.   (Duven Decl. ¶ 3)   The first four digits do not contain sensitive information specific to the cardholder but instead include the digits that identify the issuing financial institution (i.e., Amex) and type of card. (*Id.*)   The only other digits allegedly contained on the receipt were the last four digits (digits 12 through 15) and those are permitted to be disclosed on the receipt under FACTA.   (Am. Compl. ¶¶ 17, 29)

Accordingly, because the first four digits that were disclosed do not reflect any sensitive information specific to the consumer, their disclosure could not have meaningfully increased the risk of identity theft.   Consequently, the concrete injury in fact requirement is not met here, and standing is therefore lacking, for this additional reason.   *See, e.g., Katz,* 872 F.3d at 120 ("the first six digits . . . is the equivalent of printing the name of the issuing institution which need not be truncated under FACTA"); *Noble*, 726 Fed. Appx. at 584 (no standing for printing digits that reveal the credit card issuer).[8]

---

[8]      Because *Kamal* was presented with a facial challenge, the court there declined to rely on extrinsic evidence in its analysis.   *Kamal,* 918 F.3d at 118.

Plaintiff sought leave to file an Amended Complaint following the decision of the Eleventh Circuit in *Muransky v. Godiva Chocolatier, Inc.,* 905 F.3d 1200 (11th Cir. 2018), to contend that he allegedly was inconvenienced in the routine act of placing a credit card receipt in his wallet and then disposing of it in some fashion at home.   (ECF No. 24-1 at 1)   *Muransky* held that plaintiffs can meet the concrete harm test for standing by alleging that they had to use "their time (and wallet space) to safely dispose of or keep the untruncated receipt" which contained the first five digits of the credit card number "so as to avoid someone finding their credit card number on their receipt." *Muransky*, 905 F.3d at 1211.   Although the operative complaint now includes similar allegations (Am. Compl. ¶¶ 33-34), they are not sufficient to establish standing.

First, in reaching that decision, the *Muransky* Court declined to consider that a credit card's first few digits refer to the issuing bank (and not any sensitive information specific to the consumer), opting instead to sidestep that point on procedural grounds that are not applicable here. *Id.* at 1213-14.   But here, unlike in *Muransky,*[9] the record does establish the innocuous nature of the additional digits that were disclosed. (Duven Decl. ¶ 3)   *Muransky* is thus inapplicable here for that reason alone.   Ultimately, because the additional information on the receipt (i.e., the first four digits) did not increase the risk of identity theft (both from a pleading standpoint and as reflected in the accompanying declaration), there was no corresponding need for the Plaintiff to take any special steps to maintain or destroy the receipt securely.   Consequently, the alleged steps

---

[9]        The issue of standing arose in *Muransky* in an unusual procedural context that further distinguishes it from the situation here.   Standing was not raised by the defendant at the case's inception but by a beneficiary who objected to a class-wide settlement that had been reached between the parties.   Standing was raised as one of this individual's objections to the district court's approval of the settlement.   *See Muransky,* 905 F.3d at 1205-06.   The Eleventh Circuit affirmed the district court's approval of the class-wide settlement and, in order to do so, it was necessary for the Court find that the named plaintiff had standing to sue.

were undertaken voluntarily and thus fail to establish standing. *Petro-Chem Processing, Inc. v. EPA,* 866 F.2d 433, 438 (D.C. Cir. 1989) (voluntarily incurred harm insufficient); *Grocery Mfrs. Ass'n v. EPA,* 693 F.3d 169, 177 (D.C. Cir. 2012) (same).

In addition, the alleged "inconvenience" that Plaintiff alleges to have experienced was routine and commonplace. *Muransky* cannot be reconciled with *Spokeo* because equating the routine act of placing a receipt in a wallet to "concrete" harm for standing purposes would have the practical effect of circumventing the rule in *Spokeo* that a bare statutory violation is insufficient. The reason is self-evident – rather than rising to the level of an inconvenience sufficient for standing purposes, the continued maintenance of an alleged improperly-issued receipt (whether in a wallet or otherwise) would seem to be required of a prospective plaintiff for evidence preservation and thus could be expected in most FCRA "receipt provision" cases.   If applied as broadly as Plaintiff seeks to do here, *Muransky* thus would have the effect of rendering *Spokeo* a nullity because a prospective plaintiff can be expected (and may be required) to maintain the receipt as evidence.

Ultimately, putting a receipt in a wallet until arriving home (and then either maintaining or disposing it in some fashion) is a routine practice that is of a different character than the examples of "time wasting" activities cited in *Muransky* as support for its holding.   *Muransky*, 905 F.3d at 1211 (citing a photo id case in the voting rights context and a case where unsolicited communications tied up the plaintiff's telephone and fax lines and made them unavailable for legitimate business purposes).   To establish standing, the asserted harm must be "'*de facto*,' 'real,' and 'actually exist[].'" *Owner-Operator Independent Drivers Ass'n v. Department of Transp.*, 879 F.3d 339, 344-45 (D.C. Cir. 2018).   Notably, the D.C. Circuit in *Jeffries* cited the analysis in

*Kamal* favorably and expressed disagreement with the analysis in *Muransky.*   *See Jeffries,* 2019 U.S. App. LEXIS 19756 at *10, 14-15 and n. 3 (disagreeing with *Muransky's* view that the statute established the tolerable level of risk, while subsequently expressing nearly complete agreement with the analysis in *Kamal*).

　　Moreover, the *Muransky* Court erred in that it looked outside the context of common law privacy violations to find a historical analog for its analysis.   In the wake of *Spokeo*, however, the "key inquiry" with respect to standing is whether the "alleged bare procedural violation . . . presents a material risk of harm to the underlying concrete interest Congress sought to protect in passing [the statute]," namely protection from identity theft.   *Crupar-Weinmann v. Paris Baquette Am.*, 861 F.3d 76, 81-82 (2d Cir. 2017).   Because the Court in *Muransky* erroneously sought guidance from unrelated contexts, such as decisions in the voting rights context, its decision that the routine practice of retaining or disposing of a receipt suffices to establish concrete harm is not persuasive.

　　And, even if alleged inconvenience could be sufficient in the FACTA context if adequately pled, Plaintiff's new allegations fail to establish that he was burdened in any way by the issuance of the receipt in this case.   Plaintiff does not allege that he had to incur any expense, or do anything outside the normal course, to "maintain" the receipt or to "safely dispose" of it.[10]   He contends only that he placed the receipt in his wallet "for many days" (an act as routine as placing the credit card itself back in a wallet) and then chose to shred the receipt when he returned to his house

---

[10]　　For instance, Mr. Heuer does not allege that he had to purchase a shredder as a result of the alleged FCRA violation or pay a vendor to shred the receipt for him.   (ECF No. 24-2, proposed Am. Compl. ¶ 34)

instead of retaining it (contrary to his obligation to preserve evidence as a prospective plaintiff).[11]
(Am. Compl. ¶¶ 33-34)

These limited, new allegations fail to plead any concrete harm sufficient to confer standing. To the contrary, they further confirm what was already apparent from the original Complaint – that no third party ever had access to the receipt and that, consequently, the issuance of the receipt never placed Plaintiff at any increased risk of identity theft for this reason alone.   Moreover, as already discussed above, the proposed new allegations fail to address the other deficiency at issue here, which is that the additional four digits on the receipt do not reflect any information unique to the consumer.   Thus, because the additional information on the receipt did not increase the risk of identity theft, there was no corresponding need for the receipt to be maintained securely or destroyed by shredding. To the extent Plaintiff incurred any inconvenience, it was gratuitous and voluntarily undertaken.   Accordingly, Plaintiff lacks standing to sue the United States and the Smithsonian, or to serve as a putative class representative,[12] and, for this additional reason, the Complaint should be dismissed.

---

[11]     The proposed amended Complaint also adds the allegation that Mr. Heuer showed his receipt to a Smithsonian employee to enter the IMAX theater.   (Am. Compl. ¶¶ 30-31)   This brief interaction also could not plausibly have resulted in harm to him since the allegation is not that the receipt was shown to a third party, but merely an agent of the Smithsonian, and, in any event, the additional four digits on the receipt did not reflect personally sensitive information.

[12]     Because Plaintiff lacks standing to assert a FCRA claim based on his April 9, 2015 transaction referenced in the Complaint, he likewise lacks standing to represent any putative class of plaintiffs.   *See Levine v. AMTRAK,* 80 F. Supp. 3d 29, 40 (D.D.C. 2015) ("Furthermore, since she does not have standing to pursue the claims pertaining to her own experiences on Amtrak trains traveling between New Jersey and Washington, D.C., she certainly does not have standing to pursue claims with regard to other Amtrak lines on which she has never traveled.")

**IV.     Request for Injunctive Relief**

The Complaint also seeks as relief "[a]n order enjoining Defendants from continuing to violate the Receipt Provision" and an order directing such compliance.   (Am. Compl. at 19)   In addition to the grounds for dismissal stated above, any such claim should be dismissed because Plaintiff has failed to plausibly plead that the Smithsonian Institution is currently issuing credit card receipts in sales transactions that are inconsistent with the requirements of FCRA.   The only specific allegation concerning the issuance of an allegedly non-compliant receipt pertains to a transaction in April 2015.   Although Plaintiff had the opportunity to recently amend the Complaint, Plaintiff did not identify in any of the amended allegations any additional non-compliant transaction.   Accordingly, Plaintiff has not plausibly pled any basis for injunctive relief.

## <u>CONCLUSION</u>

For the foregoing reasons, the Complaint should be dismissed.

Respectfully submitted,

JESSIE K. LIU
D.C. BAR # 472845
United States Attorney

DANIEL F. VAN HORN
D.C. BAR # 924092
Civil Chief

By:  _____/s/_____
JEREMY S. SIMON, D.C. BAR #447956
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-2528
Jeremy.simon@usdoj.gov

28