# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NEIL H. HEUER, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:17-cv-00147-TSC |
| | ) | |
| SMITHSONIAN INSTITUTION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN
## OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

Cory L. Zajdel, Esq.
Z LAW, LLC
2345 York Road, Suite #B-13
Timonium, MD 21093
Telephone: (443) 213-1977
E-mail: clz@zlawmaryland.com

Glenn C. Etelson, Esq.
Allison Baker Shealy, Esq.
SHULMAN, ROGERS, GANDAL,
    PORDY & ECKER, P.A.
12505 Park Potomac Avenue, Sixth Floor
Potomac, MD 20854-6803
Telephone: (301) 230-5200
E-mail:    getelson@shulmanrogers.com
           ashealy@shulmanrogers.com

*Counsel for Plaintiff Neil H. Heuer and All Proposed Class Plaintiffs*

October 24, 2019

## TABLE OF CONTENTS

**ORAL HEARING REQUEST** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**PRELIMINARY STATEMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-3

**RELEVANT FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-4

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-37

    I.     STATUTORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-8

          A.      The FCRA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-6

          B.      The "Receipt Provision" of FCRA . . . . . . . . . . . . . . . . . . . . . . . . 6-8

    II.    STANDARD OF REVIEW UNDER 12(b)(1) AND 12(b)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-11

    III.   FCRA CONTAINS AN EXPRESS AND UNEQUIVOCAL WAIVER OF THE FEDERAL GOVERNMENT'S SOVEREIGN IMMUNITY . . . . . . . . . . . . . . . 11-23

          A.      The Federal Government was covered by the FCRA as a "person" from the original enactment of the FCRA in 1970 . . . . . . . . . . . . . . . . . . . 13-14

          B.      The Federal Government was covered by the FCRA as a "user of information" from the original enactment of the FCRA in 1970 . . . . 14-15

          C.      The Federal Government has been covered by the FCRA as a "person" since the 1996 amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-17

          D.      Recent judicial decisions have held that the FCRA and a related consumer protection statute contain an unequivocal waiver of sovereign immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-23

    IV.   PLAINTIFF HEUER HAS ESTABLISHED THAT HE HAS CONSTITUTIONAL STANDING BECAUSE HE HAS ALLEGED FACTS PLAUSIBLY SHOWING THAT HE SUFFERED A PARTICULARIZED AND CONCRETE INJURY . . 23-37

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

# **TABLE OF AUTHORITIES**

## Cases

*Alliance For Democracy v. Federal Election Com'n*, 2005 WL 503729 (D.D.C. March 4, 2005) . ............................................................................................................................................. 9
*Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015) .................................................................... 10
*Ashcroft v. Iqbal*, 556 U.S. 662 (2009*)* ................................................................................ 11
*Ashraf-Hassan v. Embassy of France*, 40 F. Supp. 3d 94, (D.D.C. 2014), *aff'd*, 610 F. App'x 3 (D.C. Cir. 2015) ..................................................................................................................... 8
*Bassett v. ABM Parking Servs., Inc.*, 883 F.3d 776 (9th Cir. 2018) ...................................... 30
*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................... 10
*Benoit v. U.S. Dep't of Agric.*, 577 F. Supp. 2d 12 (D.D.C. 2008)........................................ 19
*Bormes v. United States*, 759 F.3d 793 (7th Cir. 2014) ...................................... 13, 16, 17, 18, 21
*Boykin v. Gray*, 895 F.Supp.2d 199 (D.D.C. 2012) ............................................................... 10
*Burgess v. United States,* 553 U.S. 124 (2008) ..................................................................... 13
*Carbon Sequestration Council v. Environmental Protection Agency*, 787 F.3d 1129 (D.C. Cir. 2015) ....................................................................................................................................... 10
*City of Waukesha v. Environmental Protection Agency,* 320 F.3d 228 (D.C. Cir. 2003)............... 9
*Conley v. Gibson,* 355 U.S. 41 (1957) .................................................................................... 10
*Crupar-Weinmann v. Paris Baguette America, Inc.*, 861 F.3d 76 (2d Cir. 2017) ................. 30, 31
*Daniel v. Nat'l Park Serv.*, 891 F.3d 762 (9th Cir. 2018).......................................................... 23
*Eco Tour Adventures, Inc. v. Jewell*, 174 F. Supp. 3d 319 (D.D.C. 2016)........................... 8, 9, 10
*Evans v. Dayton Newspapers, Inc.*, 566 N.E.2d 704 (Ohio Ct. App. 1989)............................... 28
*F.A.A. v. Cooper,* 566 U.S. 284 (2012) .................................................................................. 17
*Federal Deposit Ins. Corp. v. Meyer*, 510 U.S. 471 (1994) ...................................................... 8
*Friends of Animals v. Jewell*, 828 F.3d 989 (D.C. Cir. 2016) ................................................. 37
*Hammer v. Sam's East, Inc.*, 754 F.3d 492 (8th Cir. 2014).............................................. 23, 37
*Hancock v. Urban Outfitters, Inc.*, 830 F.3d 511 (D.C. Cir. 2016) ........................................ 25, 26
*In re: Nickelodeon Consumer Privacy Litigation*, 827 F.3d 262 (3d Cir. 2016)................... 34-35
*In re: Subpoena In Collins*, 524 F.3d 249 (D.C. Cir. 2008) ...................................................... 11
*In re: Horizon Healthcare Services Inc. Data Breach Litigation*, 846 F.3d 625 (3d Cir. 2017)...... ............................................................................................................................................. 35-36
*Ingram v. Experian Info. Solutions, LLC*, 2017 WL 2507694 (N.D. Miss. June 9, 2017) ..... 18, 22
*Jeffries v. Volume Services America, Inc., 928 F.3d 1059 (D.C. Cir. 2019)* ... 2, 25, 27, 31, 32, 34
*Jerome Stevens Pharm., Inc. v. Food and Drug Admin.*, 402 F.3d 1249 (D.C. Cir. 2005) ......... 10
*Kamal v. J. Crew Group,* 918 F.3d 102 (3d Cir. 2019) ........................................................... 34
*Kowal v. MCI Commc'ns Corp.,* 16 F.3d 1271 (D.C. Cir. 1994) ............................................. 10
*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ........................................................... 25, 35
*Malewicz v. City of Amsterdam*, 362 F. Supp. 2d 298 (D.D.C. 2005)....................................... 8, 9
*Meyers v. Nicolet Restaurant of De Pere, LLC*, 843 F.3d 724 (7th Cir. 2016) ........................... 31
*Misra v. Smithsonian Astrophysical Observatory*, 248 F.3d 37 (1st Cir. 2001).......................... 11
*Mooneyham v. Equifax Information Services, LLC*, 99 F. Supp. 3d 720 (W.D. Ky. 2015) ......... 18
*Moore v. U.S. Department of Agriculture*, 55 F.3d 991 (5th Cir. 1995) .................. 18, 19, 20, 22
*Muransky v. Godiva Chocolatier, Inc.,* 905 F.3d 1200 (11th Cir. 2018) .................. 26, 27, 31, 34

*Parker v. District of Columbia,* 478 F.3d 370 (D.C. Cir. 2007), *aff'd sub nom. District of Columbia v. Heller,* 554 U.S. 570 (2008) ................................................................. 9

*Parks v. IRS*, 618 F.2d 677 (10th Cir. 1980).................................................................. 27

*Pavesich v. New England Life Ins. Co.*, 50 S.E. 68 (Ga. 1905)................................... 26

*Pichler v. UNITE*, 542 F.3d 380 (3d Cir. 2008) .......................................................... 27

*Pontbriand v. Sundlun*, 699 A.2d 856 (R.I. 1997)....................................................... 28

*Safeco Ins. Co. of America v. Burr*, 551 U. S. 47 (2007).......................................... 4, 29

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) ................................... 2, 24, 25, 26, 34, 35, 36, 37

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998)....................................... 24

*Strubel v. Comenity Bank*, 842 F.3d 181 (2d Cir. 2016)............................................. 25

*Summers v. Earth Island Institute*, 555 U.S. 488 (2009) .......................................... 25

*Susinno v. Work Out World Inc.*, 2017 WL 2925432 (3d Cir. July 10, 2017)............. 36

*Talley v. U.S. Dep't of Agriculture*, 2007 WL 2028537 (N.D. Ill. Jul. 12, 2007) ....... 18

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001).................................................................. 4, 29

*United States v. Bormes*, 568 U.S. 6 (2012) .............................................................. 36

*Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037 (9th Cir. 2017)............... 36

*Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765 (2000) ....... ........................................................................................................................... 12, 13

*William Penn Apartments v. D.C. Court of Appeals*, 39 F. Supp. 3d 11 (D.D.C. 2014)............... 8

*Williams v. Conner*, 522 F. Supp. 2d 92 (D.D.C. 2007)............................................. 19

*Williams v. Glickman*, 936 F. Supp. 1 (D.D.C. 1996) ............................................... 11

*Yohay v. City of Alexandria Employees Credit Union*, 827 F.2d 967 (4th Cir. 1987) ........... 14-15

## Statutes

1 U.S.C.A. § 1 (West, Westlaw through Pub. L. No. 115-43)......................................... 12

15 U.S.C.A. § 1602(d) (West, Westlaw through Pub. L. No. 115-43) ........................... 19

15 U.S.C.A. § 1602(e) (West, Westlaw through Pub. L. No. 115-43) ........................... 19

15 U.S.C.A. § 1602(f) (West, Westlaw through Pub. L. No. 115-43) ............................ 19

15 U.S.C.A. § 1612(b) (West, Westlaw through Pub. L. No. 115-43) ........................... 19

15 U.S.C.A. § 1640 (West, Westlaw through Pub. L. No. 115-43)................................. 19

15 U.S.C.A. § 1681a(b) (West, Westlaw through Pub. L. No. 115-43) ....................... 5, 13

15 U.S.C.A. § 1681a(f) (West, Westlaw through Pub. L. No. 115-43).......................... 5, 14

15 U.S.C.A. § 1681b(3) (West, Westlaw through Pub. L. No. 115-43) ......................... 15

15 U.S.C.A. § 1681b(4) (West, Westlaw through Pub. L. No. 115-43) ......................... 15

15 U.S.C.A. § 1681c(g)(1) (West, Westlaw through Pub. L. No. 115-43)................... 4-5, 7

15 U.S.C.A. § 1681c(g)(3) (West, Westlaw through Pub. L. No. 115-43)..................... 8

15 U.S.C.A. § 1681f (West, Westlaw through Pub. L. No. 115-43) ............................... 15

15 U.S.C.A. § 1681n (West, Westlaw through Pub. L. No. 115-43)............................. 6, 17

15 U.S.C.A. § 1681t(b)(5)(A) (West, Westlaw through Pub. L. No. 115-43)............... 34-35

15 U.S.C.A. § 1691a(e) (West, Westlaw through Pub. L. No. 115-43) ......................... 20

15 U.S.C.A. § 1691a(f) (West, Westlaw through Pub. L. No. 115-43) .......................... 20

15 U.S.C.A. § 1691e(a) (West, Westlaw through Pub. L. No. 115-43) ......................... 20

15 U.S.C.A. § 1691e(b) (West, Westlaw through Pub. L. No. 115-43) ......................... 20

15 U.S.C.A. §§ 1601-1667f (West, Westlaw through Pub. L. No. 115-43) ................... 19

15 U.S.C.A. §§ 1681-1681x (West, Westlaw through Pub. L. No. 115-43) ................... 3

15 U.S.C.A. §§ 1691-1691f (West, Westlaw through Pub. L. No. 115-43) ................... 17

47 U.S.C.A. § 153(39) (West, Westlaw through Pub. L. No. 115-43) ........................................ 21

47 U.S.C.A. § 227 (West, Westlaw through Pub. L. No. 115-43) .......................................... 21

Act of July 30, 1947, ch. 388, Pub. L. No. 80-278, 61 Stat. 633 ................................. 12

Act of Oct. 26, 1970, Pub. L. No. 91-508, sec. 601, § 602(b), 84 Stat. 1114, 1128 (codified, as amended at 15 U.S.C.A. § 1681(a)(4) and (b) (West, Westlaw through Pub. L. No. 115-43) .....
................................................................................................................................ 4, 5, 6, 13, 14

Act of Oct. 28, 1974, Pub. L. No. 93-495, 88 Stat. 1500, 1524-25 (codified, as amended, at 15 U.S.C.A. §§ 1691-1691f (West, Westlaw through Pub. L. No. 115-43) ................................ 20

Consumer Credit Protection Act, Pub. L. No. 90-321, 84 Stat. 146 (1968) ................................ 19

Credit and Debit Card Receipt Clarification Act of 2007, Pub. L. 110-241, 122 Stat. 1565 (2008)
......................................................................................................................................... 29, 30

Equal Credit Opportunity Act Amendments of 1976, Pub. L. No. 94-239, , 90 Stat. 251. ..... 20-21

Fair and Accurate Credit Transactions Act of 2003, Pub. L. No. 108–159, 117 Stat. 1952............
................................................................................................................................................*Passim*

Omnibus Consol. Approp. Act, Pub. L. No. 104-208, 110 Stat. 3009 (1996) ........................ 15-16

**Other Authorities**

154 Cong. Rec. H3730 (daily ed. May 13, 2008) ........................................................ 30

2 Pub. Papers 1676 (Dec. 4, 2003) ................................................................................................ 8

Brief for the United States as Intervener, *Hammer v. Sam's East, Inc*., 754 F.3d 492 (8th Cir. 2014) (Nos. 12-3724, 12-3858), 2013 WL 6221843 ................................................. 23-24

Federal Trade Commission, Identity Theft Survey Report (2003) ................................ 7

*FTC, 40 Years of Experience With the Fair Credit Reporting Act, An FTC Report With Summary Interpretations*, p. 70 (Jul. 2011) (available at https://www.ftc.gov/sites/default/files/documents/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations/110720fcrareport.pdf) (last visited Oct. 22, 2019) ................................................................................................................................. 16

H.R. Rep. No. 108-263 (2003) ................................................................................... 6, 15

H.R. Rep. No. 94-210 (1975) ................................................................................................. 21

Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, CG Docket No. 02-278, FCC No. 16-72 (July 5, 2016) ................................................. 21

S. Rep. No. 104-185 (1995) ........................................................................................... 4

S. Rep. No. 108-166 (2003) ........................................................................................... 7

Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 HARV. L. REV. 193 (1890) ........
....................................................................................................................................... 26, 27

The Fair Credit Reporting Act and Issues Presented by Reauthorization of the Expiring Preemption Provisions, Hearings Before the S. Comm. On Banking, Housing, and Urban Affairs, 108th Cong. 49 n.17 (2003) ....................................................................... 7

**Treatises**

RESTATEMENT (FIRST) OF TORTS § 1 (Am. Law Inst. 1939) ................................... 35

RESTATEMENT (SECOND) OF TORTS § 652A (Am. Law Inst. 1977) .......................... 26

RESTATEMENT (SECOND) OF TORTS § 652B (Am. Law Inst. 1977) .......................... 28

RESTATEMENT (SECOND) OF TORTS § 652D (Am. Law Inst. 1977) ...................... 27, 28

## ORAL HEARING REQUESTED

In accordance with Local Rule 7(f), Mr. Heuer hereby requests an oral hearing on Defendants' Motion to Dismiss.

## PRELIMINARY STATEMENT

Named Plaintiff Neil H. Heuer ("Plaintiff" or "Mr. Heuer"), on behalf of himself and all other similarly situated persons, by counsel, submits this Opposition to the Motion by Defendants Smithsonian Institution ("Smithsonian") and United States of America ("USA") (collectively "Defendants") to dismiss Mr. Heuer's Amended Complaint for lack of subject-matter jurisdiction under the authority of Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure (the "Motion"; ECF No. 35).

Mr. Heuer brings this civil action in response to the Smithsonian's unlawful electronic printing of a receipt containing more information about Mr. Heuer's credit card than is permitted by the Fair Credit Reporting Act (the "FCRA"), 15 U.S.C. §§ 1681, *et seq*. Defendants argue that this case must be dismissed for lack of subject-matter jurisdiction because: (1) the FCRA does not contain an unequivocal waiver of the Federal Government's sovereign immunity and, as a result, Mr. Heuer's claims are barred by that immunity; and (2) Mr. Heuer's Amended Complaint fails to show that he has standing to bring this suit within the meaning of Article III of the U.S. Constitution because Mr. Heuer fails to allege facts plausibly establishing that he has suffered a legally cognizable injury-in-fact. Neither of Defendants' arguments withstand scrutiny.

Regarding sovereign immunity, no such defense exists in this case. The FCRA subjects all "persons" to varying degrees of liability for negligent and willful violations of its provisions, and the term "person" is defined to include any "government or governmental subdivision or

agency." Contrary to the Government's position, Congress's amendment of the FCRA in 1996—which made all "persons" liable for violations of the statute, instead of merely "consumer reporting agencies" and "users of information"—did not itself create a waiver of sovereign immunity. Rather, the waiver occurred in 1970, when the definition of "person" was first enacted, because the terms "consumer reporting agency" and "user of information" were defined to include "persons." As a result, the Government has been liable for damages under the FCRA from the very first moment of its enactment. Even if this was not originally the case, Congress's decision in 1996 to subject all "persons" to liability for violations of the FCRA amounts to an unequivocal waiver of sovereign immunity. Judicial decisions from the Seventh and Fifth Circuits, as well as from this Court and several other district courts around the country, support this unremarkable proposition.

On the issue of standing, Mr. Heuer has alleged sufficient facts that plausibly establish that he has suffered a particularized and concrete injury in fact, and thus that he has standing to bring this claim. Under the analytical framework discussed in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016), Mr. Heuer has standing because the claim upon which his suit is grounded is analogous to the common-law claim for invasion of privacy, which has been recognized by the common-law courts in this country for well over a century. In addition, even if an analogous common-law tort did not exist, applicable Supreme Court and District of Columbia Circuit Court precedent recognizes that where, as here, Congress has afforded an individual a procedural right to protect his concrete interests, he has standing to enforce that right in court. *Jeffries v. Volume Services America, Inc*., 928 F.3d 1059 (D.C. Cir. 2019). This is because Congress has the authority to elevate to the status of legally cognizable concrete injuries, *de facto* injuries that were previously inadequate in law. Congress did precisely this by mandating the truncation of

financial account numbers on electronically printed credit card and debit card receipts, a requirement that was added to the FCRA in 2003 by the Fair and Accurate Credit Transactions Act ("FACTA").

For all these reasons, and as discussed more fully below, Mr. Heuer's claims are not barred by sovereign immunity, and he has constitutional standing to assert his claim against Defendants. Accordingly, Defendants' Motion to Dismiss should be denied.

## RELEVANT FACTS

On January 23, 2017, Mr. Heuer filed a Class Action Complaint against Smithsonian Institution and USA. (*See* ECF No. 1.) After a stay of this action and permission from the Court, Mr. Heuer filed an Amended Class Action Complaint ("Amended Complaint") against Smithsonian and USA. ECF No. 34 ("Am. Compl."). The Amended Complaint asserts violations of section 1681c(g) of the FCRA, 15 U.S.C.A. §§ 1681-1681x (West, Westlaw through Pub. L. No. 115-43), as amended by FACTA, resulting from Defendants' issuance of electronically printed receipts that contained the first four and last four digits of each Class member's credit card number. (Am. Compl. ¶¶ 21, 29, 32 & 56.) As alleged in the Amended Complaint, on or about April 9, 2015, Mr. Heuer purchased eight tickets to view a movie playing at the Smithsonian IMAX theater in Washington, DC. (Am. Compl. ¶¶ 26 and 55.) Mr. Heuer used his credit card to pay for the tickets. (Am. Compl. ¶¶ 27 and 55.) The Smithsonian issued to Mr. Heuer a proof of purchase in the form of an electronically printed receipt that included both the first four and last four digits of his credit card account number. (Am. Compl. ¶¶ 29 and 56.) The electronically printed receipt also contained Mr. Heuer's full name and a written description of the credit card he used. (Am. Compl. ¶¶ 29 and 56.) Mr. Heuer was required to provide the electronically printed receipt to another person in order to gain entrance into the IMAX theater.

(Am. Compl. ¶ 30.) After receiving the electronically printed receipt back, Mr. Heuer placed the electronically printed receipts in his wallet and maintained the receipts for many days until he arrived home from vacation and shredded the electronically printed receipts. (Am. Compl. ¶¶ 31 and 33-34.)

**ARGUMENT**

## I.   STATUTORY BACKGROUND.

### A.   The FCRA.

Congress enacted the FCRA in 1970 in order to protect the "consumer's right to privacy" by ensuring "the confidentiality . . . and proper utilization" of consumer credit information by "consumer reporting agencies." Act of Oct. 26, 1970, Pub. L. No. 91-508, sec. 601, § 602(b), 84 Stat. 1114, 1128 (codified, as amended at 15 U.S.C.A. § 1681(a)(4) and (b) (West, Westlaw through Pub. L. No. 115-43)); *see also Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 52 (2007) ("Congress enacted FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy"); *TRW Inc. v. Andrews*, 534 U.S. 19, 23 (2001) (stating that FCRA was enacted in part to "protect consumer privacy"). A motivating factor for the FCRA and subsequent amendments was a "concern[]" that allowing access to sensitive and confidential financial information in consumer reports "may create an improper invasion of privacy." *See* S. Rep. No. 104-185, at 35 (1995). The FCRA fosters these purposes through a set of interlocking requirements, including a strict limitation on the authority to disclose a consumer's sensitive and confidential financial information associated with a credit card. *See* 15 U.S.C.A. § 1681c(g)(1) (West, Westlaw through Pub. L. No. 115-43) (providing that, subject to certain exceptions not relevant here, "no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of the sale or

4

transaction.") (the "Receipt Provision").

At the time FCRA was enacted in 1970, FCRA provided any "consumer" the right to file a lawsuit for any willful violation of the FCRA and subjected any "consumer reporting agency" or "user of information" to liability for damages. Act of Oct. 26, 1970, Pub. L. No. 91-508, sec. 601, § 616, 84 Stat. 1114, 1134 (codified, as amended, at 15 U.S.C.A. § 1681n (West, Westlaw through Pub. L. No. 115-43)) ("Any *consumer reporting agency* or *user of information* which willfully fails to comply with any requirement imposed under this title with respect to any consumer is *liable to that consumer* . . . .") (emphasis added). Since its original enactment, FCRA has always defined "consumer reporting agency" to mean "any *person* which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports." *Compare* Act of Oct. 26, 1970, Pub. L. No. 91-508, sec. 601, § 603(f), 84 Stat. 1114, 1129 *with* 15 U.S.C.A. § 1681a(f) (West, Westlaw through Pub. L. No. 115-43) (definition unchanged since original enactment) (emphasis added). The defined term "consumer reporting agency" includes the defined term "person." Since its original enactment, FCRA always has defined "person" to mean "any individual, partnership, corporation, trust, estate, cooperative, association, *government or governmental subdivision or agency*, or other entity." *Compare* Act of Oct. 26, 1970, Pub. L. No. 91-508, sec. 601, § 603(b), 84 Stat. 1114, 1128 *with* 15 U.S.C.A. § 1681a(b) (West, Westlaw through Pub. L. No. 115-43) (definition unchanged since original enactment) (emphasis added). Congress specifically included each of the Federal Trade Commission, Comptroller of the Currency, Federal Reserve Board, Federal Deposit Insurance

Corporation, Federal Savings and Loan Insurance Corporation, National Credit Union Administration, Interstate Commerce Commission, Civil Aeronautics Board, and Secretary of Agriculture within FCRA's definition of "government agency."[1] Act of Oct. 26, 1970, Pub. L. No. 91-508, sec. 601, § 621, 84 Stat. 1114, 1134-35 (codified, as amended, at 15 U.S.C.A. § 1681s(a)(1) and (b)(1)(A)-(G) (West, Westlaw through Pub. L. No. 115-43)). In 1996, Congress amended the FCRA to clarify that liability for damages to "consumers" can be recovered against any "person," not just against a "consumer reporting agency or user of information." 15 U.S.C.A. § 1681n (West, Westlaw through Pub. L. No. 115-43) ("Any person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer.").

## B.     The "Receipt Provision" of FCRA.

In 2003, Congress passed the Fair and Accurate Credit Transactions Act of 2003, Pub. L. No. 108–159, 117 Stat. 1952 ("FACTA"), which made significant changes to FCRA; preempted state laws affecting the credit reporting industry, including an individual's ability to pursue common-law invasion of privacy claims; and introduced new federal measures to protect consumers from identity theft—a problem that had "reached almost epidemic proportions in recent years." H.R. Rep. No. 108-263, at 25 (2003).

Identity theft occurs when someone commits fraud by using another person's identifying information—such as a social security number or credit account number. The fraud could include applying for or using credit in another's name, obtaining bank loans, employment, utility or cell

---

[1] Thus, the statute declares that Federal Trade Commission to be the principal agency in charge of enforcement, except to the extent that enforcement authority is expressly conferred to one of these other, specifically enumerated "agencies." As a result, Defendants cannot credibly argue that the terms "government or governmental subdivision or agency" do not include agencies of the Federal Government.

phone service, or similar illegal conduct in the "true name" identity of the consumer whose information was misappropriated. *See* The Fair Credit Reporting Act and Issues Presented by Reauthorization of the Expiring Preemption Provisions, Hearings Before the S. Comm. On Banking, Housing, and Urban Affairs, 108th Cong. 49 n.17 (2003) (Statement of J. Howard Beales, III, Director, Bureau of Consumer Protection, U.S. Federal Trade Commission). Anyone who owns a credit card, checking account, or savings account is a potential victim.

A 2003 study released by the FTC revealed that the cost of identity theft to consumers and the nation was staggering: over 27 million Americans, or one in eight of all adults, had been victims in the past five years, and the estimated cost to consumers and the economy was over fifty billion dollars annually. *See* Federal Trade Commission, Identity Theft Survey Report (2003).

The Senate Committee on Banking, Housing, and Urban Affairs explained that FACTA and the Receipt Provision were intended to "*protect consumers from identity thieves.*" S. Rep. No. 108-166, at 3 (2003) (emphasis added). Thus, according to the Committee, the "legislation requires the truncation of credit and debit card account numbers on electronically printed receipts to prevent criminals from obtaining easy access to such key information." S. Rep. No. 108-166, at 3 (2003). The Committee further emphasized that this provision was intended to "limit the number of opportunities for identity thieves to 'pick off' key card account information." S. Rep. No. 108-166, at 3 (2003). FACTA amended FCRA to prohibit any "person" from printing "more than the last 5 digits of the [credit] card number or the expiration date upon any [electronically printed] receipt provided to the cardholder at the point of the sale or transaction." 15 U.S.C.A. § 1681c(g)(1) (West, Westlaw through Pub. L. No. 115-43). Although the language of the amendment prohibits the printing of either account numbers "or" expiration dates, the focus at

the time was the account number truncation requirement (and the statute was later amended to make this intent clear).

As President George W. Bush declared in signing the Act, "this law will help prevent identity theft before it occurs, by requiring merchants to delete all but the last five digits of a credit card number of store receipts." 2 Pub. Papers 1676 (Dec. 4, 2003). To ensure that businesses complied with the new law, the FTC and the major credit card companies extensively publicized the truncation requirement. The new law's effective date also was delayed until January 1, 2005, for credit-card receipt printers first put into use on or after that date, and until December 4, 2006, for printers in use prior to January 1, 2005. 15 U.S.C.A. § 1681c(g)(3) (West, Westlaw through Pub. L. No. 115-43).

## II.   STANDARD OF REVIEW UNDER RULE 12(b)(1) AND 12(b)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE.

A motion arguing that a claim is barred by sovereign immunity or that the claimant lacks standing is a challenge to this Court's subject-matter jurisdiction. *See Ashraf-Hassan v. Embassy of France*, 40 F. Supp. 3d 94, 99 (D.D.C. 2014), *aff'd*, 610 F. App'x 3 (D.C. Cir. 2015); *see also Federal Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 475 (1994) ("Sovereign immunity is jurisdictional in nature"; terms of the United States' "consent to be sued in any court define that court's jurisdiction to entertain the suit"); *Eco Tour Adventures, Inc. v. Jewell*, 174 F. Supp. 3d 319, 324 (D.D.C. 2016) (lack of standing evaluated as a challenge to subject-matter jurisdiction). "Jurisdiction is a threshold issue which ordinarily must be addressed before the merits of the case are reached." *William Penn Apartments v. D.C. Court of Appeals*, 39 F. Supp. 3d 11, 15 (D.D.C. 2014).

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, which governs challenges to subject-matter jurisdiction, the plaintiff bears "the burden of establishing by a preponderance

8

of the evidence that the Court possesses jurisdiction." *Malewicz v. City of Amsterdam*, 362 F. Supp. 2d 298, 305 (D.D.C. 2005). In evaluating a Rule 12(b)(1) motion, "a court is not limited to the allegations set forth in the complaint, 'but may also consider material outside of the pleadings in its effort to determine whether the court has jurisdiction in the case.'" *Id.* (quoting *Alliance For Democracy v. Federal Election Com'n*, 2005 WL 503729, at *3 (D.D.C. March 4, 2005)). Furthermore, "a district court must accept the allegations of the complaint as true, and construe all inferences in the plaintiff's favor." *Malewicz*, 362 F. Supp. 2d at 305-06. In the case of a motion to dismiss based on sovereign immunity, however, "which provides protection from suit and not merely a defense to liability," this Court "must engage in sufficient pretrial factual and legal determinations to satisfy itself of its authority to hear the case before trial." *Id.* at 306. This requires looking "beyond the parties' pleadings to resolve any factual disputes that are essential to its decision to retain jurisdiction or dismiss the action." *Id.*

A challenge to the plaintiff's standing requires this Court to assume that the plaintiff states a valid legal claim. *Eco Tour Adventures, Inc. v. Jewell*, 174 F. Supp. 3d 319, 324 (D.D.C. 2016); *City of Waukesha v. EPA,* 320 F.3d 228, 235 (D.C. Cir. 2003) ("the court must be careful not to decide the question on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims."); *see also Parker v. District of Columbia,* 478 F.3d 370, 377 (D.C. Cir. 2007), *aff'd sub nom. District of Columbia v. Heller,* 554 U.S. 570 (2008) ("The Supreme Court has made clear that when considering whether a plaintiff has Article III standing, a federal court must assume *arguendo* the merits of his or her legal claim."). Thus, for the purpose of standing, this Court must assume that Defendants violated the Receipt Provision when they published a receipt containing Heuer's sensitive, confidential financial information. "In such cases, the plaintiff bears the burden of 'show[ing] a

substantial probability that [he or she has] been injured, that the defendant caused [his or her] injury, and that the court could redress that injury.'" *Jewell*, 174 F. Supp. 3d at 324 (quoting *Carbon Sequestration Council v. Environmental Protection Agency*, 787 F.3d 1129, 1133 (D.C. Cir. 2015)) (brackets original). "'Each element of standing must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.'" *Id.* (quoting *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015)). Consequently, "where the plaintiff's standing is challenged under Rule 12(b)(1), the court must accept the well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor." *Id.* (internal quotation marks omitted). "In addition, to assure itself of its jurisdiction over a claim, 'the district court may consider materials outside the pleadings.'" *Id.* (quoting *Jerome Stevens Pharm., Inc. v. Food and Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005)).

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, to survive a motion to dismiss for alleged failure to state a claim, a complaint must satisfy the lenient pleading standards of Fed. R. Civ. P. 8(a), which "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the … claim is and the grounds upon which it rests[.]'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The plaintiff does not have to provide "detailed factual allegations," *id.*, but rather "enough factual matter (taken as true) to suggest" there is a cognizable cause of action. *Id.* at 556. A "complaint 'is construed liberally in the [plaintiff's] favor, and [the Court should] grant [the plaintiff] the benefit of all inferences that can be derived from the facts alleged.'" *Boykin v. Gray*, 895 F.Supp.2d 199, 205 (D.D.C. 2012) (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)). The Amended

Complaint contains more than "[t]hreadbare recitals of the elements of a cause of action" rejected by *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and, therefore, this Court must deny Defendant's Motion.

## III.   FCRA CONTAINS AN EXPRESS AND UNEQUIVOCAL WAIVER OF THE FEDERAL GOVERNMENT'S SOVEREIGN IMMUNITY.

According to Defendants, the "threshold issue in this case is whether Congress waived the immunity of the United States by amending the remedial provisions of the FCRA (sections 1681n and 1681o) in 1996 to include the term "person," which is a term broadly defined in section 1681a(b) to include" any "government or governmental subdivision or agency." Motion at 7.[2] The "threshold issue," however, is broader than Defendants' characterization.

As best as counsel can understand, Defendants contend that FCRA's defined term "person" including any "government or governmental subdivision or agency" only sometimes means USA and Smithsonian, and other times does not. This extraordinary word play allows USA and Smithsonian to somehow argue that as a "person," USA and Smithsonian are subject to the FCRA's substantive requirements but at the same time neither USA and Smithsonian are a "person" for the purposes of the FCRA's remedies.[3] (*See* Motion at 7-18.) According to

---

[2] Defendants also argue that Smithsonian is covered by the Federal Government's sovereign immunity. (Motion at 5-6.) The District of Columbia Circuit has never held (although it has, in dicta, suggested) that Smithsonian qualifies as a sovereign and therefore is entitled to assert the defense of sovereign immunity. *See In re: Subpoena In Collins*, 524 F.3d 249, 252 (D.C. Cir. 2008). The only Circuit actually to so hold is the First Circuit. *See Misra v. Smithsonian Astrophysical Observatory*, 248 F.3d 37 (1st Cir. 2001). It is not necessary to reach such a decision here because even if the Smithsonian is entitled to assert sovereign immunity as the Federal Government, such immunity has been waived by the Fair Credit Reporting Act ("FCRA").

[3] The Federal Government has previously conceded in this court that it is subject to liability under a related consumer protection statute. *Williams v. Glickman*, 936 F. Supp. 1, 3 (D.D.C. 1996) ("The Secretary's Motion for Judgment, in Part, on the Pleadings asserts that all of the plaintiffs' claims for damages (except those brought under ECOA) are barred by sovereign immunity.").

Defendants, this argument is based on a 1996 amendment to the FCRA that substituted the word "person" for "consumer reporting agency" in the remedies sections. Defendants' argument fails for several important reasons.

First, the underlying premise of Defendants' argument—that USA only became subject to the FCRA's substantive requirements by virtue of the 1996 amendments to the FCRA—is wrong. In 1947, Congress established a general rule of statutory construction that, "[i]n determining the meaning of any Act or resolution of Congress . . . the word 'person' may extend and be applied to partnerships and corporations." Act of July 30, 1947, ch. 388, Pub. L. No. 80-278, 61 Stat. 633, § 1 (codified, as amended at 1 U.S.C.A. § 1 (West, Westlaw through Pub. L. No. 115-43)). As it currently stands today, this rule prescribes that, "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise . . . the words 'person' and 'whoever' include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C.A. § 1 (West, Westlaw through Pub. L. No. 115-43). The Supreme Court has consistently held that when Congress uses the term "person" in a federal law and does not otherwise define the term "person" within the specific law differently from the general definition set forth in section 1 of Title 1 of the U.S. Code, the term "person" should not be interpreted to include persons or entities other than those specified in the general definition. *See, e.g., Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 782 (2000) (noting that while corporations are presumptively covered by the False Claims Act by virtue of 1 U.S.C. § 1, States are not presumptively covered absent being explicitly mentioned in the False Claims Act itself). For this reason, the Supreme Court has explained, there is a "longstanding interpretive presumption that 'person' does not include the sovereign" that "may be disregarded only upon some affirmative showing of statutory intent

to the contrary." *Id*. at 780-81. And the only additions to the definition of "person" from the statutory presumptive definition are "any . . . trust, estate, cooperative, . . . government or governmental subdivision or agency[.]" 15 U.S.C.A. § 1681a(b).

The natural implication of this presumption is that the FCRA's definition of "person," which is more expansive than the general definition that otherwise would have applied, and includes any "government or governmental subdivision or agency," demonstrates Congress's clear intent to subject the Federal Government to ***all*** provisions of the FCRA that apply to "persons." *Burgess v. United States*, 553 U.S. 124, 129 (2008) ("When a statute includes an explicit definition, we must follow that definition."). As a result, while Defendants (unsurprisingly) concede that they are and always have been covered by the definition of "person" for the purposes of FCRA's substantive provisions (*see* Motion at 14; *see also Bormes v. United States*, 759 F.3d 793, 795 (7th Cir. 2014) ("The United States concedes that it is a 'person' for the purpose of the [FCRA's] substantive requirements.")), the Federal Government was actually exposed to liability for damages as a "person" from the very moment the FCRA was enacted in 1970. Two provisions of the FCRA illustrate this reality.

### A.   The Federal Government was covered by the FCRA as a "person" from the original enactment of the FCRA in 1970.

Since its enactment in 1970, the FCRA always has defined a "person" as "any individual, partnership, corporation, trust, estate, cooperative, association, ***government or governmental subdivision or agency***, or other entity." *Compare* Act of Oct. 26, 1970, Pub. L. No. 91-508, sec. 601, § 603(b), 84 Stat. 1114, 1128 (emphasis added) *with* 15 U.S.C.A. § 1681a(b) (West, Westlaw through Pub. L. No. 115-43) (definition unchanged since original enactment). The FCRA originally identified two broad groups that were subject to liability: (1) any "consumer reporting agency;" and (2) any "user of information." The FCRA always has defined a

"consumer reporting agency" as "any *person* which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports." *Compare* Act of Oct. 26, 1970, Pub. L. No. 91-508, sec. 601, § 603(f), 84 Stat. 1114, 1129 (emphasis added) *with* 15 U.S.C.A. § 1681a(f) (West, Westlaw through Pub. L. No. 115-43) (definition unchanged since original enactment). The defined term "consumer reporting agency" has always included the separately defined term "person." Consequently, the FCRA subjected any "person" to liability if that "person" met the additional requirements of the "consumer reporting agency" definition when FCRA was enacted in 1970. Whether or not the Federal Government actually qualified as a "consumer reporting agency" in 1970 is not important to this analysis. Instead, Defendants' argument that the FCRA does not contain an unequivocal waiver of sovereign immunity is refuted by Congress's original understanding that the Federal Government, as a "person," would be subject to damages if it acted as a "consumer reporting agency."

**B.    The Federal Government was covered by the FCRA as a "user of information" from the original enactment of the FCRA in 1970.**

The Federal Government's potential to be held liable as a "consumer reporting agency" under the FCRA, as originally enacted in 1970, is not the only instance in which sovereign immunity had been unequivocally waived. Defendants ignore the fact that the Federal Government was also subject to liability under the FCRA, as originally enacted, if its conduct qualified it as a "user of information." Although not defined by the FCRA, a "user of information," as used in the statute, includes any person who purchases or uses consumer reports from a "credit reporting agency," regardless of whether the person is "the ultimate destination of

a credit report" or "the person who acquires [a credit report] for another." *Yohay v. City of Alexandria Employees Credit Union*, 827 F.2d 967, 973 (4th Cir. 1987) (brackets in original). Surely Defendants do not contend that the Federal Government could have never qualified as a "user of information" under the 1970 version of the FCRA, given that, even then, the Federal Government was one of the nation's largest lenders, investigators, and employers. *See* H.R. Rep. No. 108-263, at 24 (2003) ("The most common users and furnishers of information are credit card issuers, auto dealers, department and grocery stores, lenders, utilities, insurers, collection agencies, and government agencies."). No such argument would be credible because the FCRA provides specific rights to, and limits the liability of, a "governmental agency" as a "user of information." *See* 15 U.S.C.A. §§ 1681f and 1681b(3) and (4) (West, Westlaw through Pub. L. No. 115-43) (requiring any "person" that is a "user of information" to provide consumer with certain pieces of information prior to taking an adverse action based on a credit report unless the "person" is "an agency or department of the United States Government" and was using the credit report for a "national security investigation.").

### C.   The Federal Government has been covered by the FCRA as a "person" since the 1996 amendments.

The second major reason undermining Defendants' argument that the FCRA does not contain an unequivocal waiver of sovereign immunity can be found in the 1996 amendments to the statute. Thus, even if this Court determines that Congress did not waive the Federal Government's sovereign immunity at the time FCRA was enacted in 1970, the 1996 amendments contain an unequivocal waiver. In 1996, Congress amended the FCRA to clarify that liability for damages to "consumers" can be recovered against any "person," not just against a "consumer

reporting agency."[4] Omnibus Consol. Approp. Act, Pub. L. No. 104-208, sec. 2412, § 616, 110 Stat. 3009, 3009-446 (1996) ("Section 616 of the Fair Credit Reporting Act (15 U.S.C. 1681n) is amended by striking 'Any consumer reporting agency or user of information which' and inserting '(a) IN GENERAL.—Any person who'."). The definition of "person" includes (as it has since 1970) any "government or governmental subdivision or agency." Defendants acknowledge that they are included within the definition of "person" for substantive coverage, but they nevertheless contend that they are not included within the definition of "person" for purposes of liability under the FCRA. There is no basis for such a distinction and it should be noted that the USA has not always held this position.[5] *See, e.g., FTC, 40 Years of Experience With the Fair Credit Reporting Act, An FTC Report With Summary Interpretations*, p. 70 (Jul. 2011) (available at https://www.ftc.gov/sites/default/files/documents/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations/110720fcrareport.pdf) (last visited Oct. 22, 2019) ("The term 'governmental agency' includes federal, state, county and municipal agencies, and grand juries.").

By modifying the FCRA's liability provisions to include any "person" in 1996, Congress

---

[4] Plaintiff does not concede that the 1996 FCRA amendment from "consumer reporting agency" to "person" in the damages section expanded FCRA coverage. Any "person" was subjected to liability under the FCRA as originally enacted but only to the extent that that "person" was acting as a "credit reporting agency[.]" The exact same group is regulated by the current version of the FCRA—any "person[.]" The only difference with the current version is that there is no longer the requirement that the "person" be acting as a "credit reporting agency[.]" Accordingly, Defendants' entire argument that the 1996 amendments to the FCRA expanded the scope of entities' potentially liable under the FCRA is without support in the statutory text.

[5] The United States Court of Appeals for the Seventh Circuit previously rejected this identical argument raised by the Federal Government by questioning "if the United States is a 'person' under § 1681a(b) for the purpose of duties, how can it not be one for the purpose of remedies[.]" Judge Easterbrook concluded that "[n]othing in the FCRA allows the slightest basis for a distinction." *Bormes v. United States*, 759 F.3d 793, 795 (7th Cir. 2014).

expressly included any "government or governmental subdivision or agency." In effect, Congress proclaimed that "[any] government or governmental subdivision or agency" who "willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer." 15 U.S.C.A. § 1681n (West, Westlaw through Pub. L. No. 115-43). Thus, regardless of burdens or standards, Congress unequivocally waived the Federal Government's sovereign immunity by subjecting any "person" to liability for violations of the FCRA. As Judge Easterbrook of the Seventh Circuit aptly put it, "Congress need not add 'we really mean it!' to make statutes effectual." *Bormes v. United States*, 759 F.3d 793, 796 (7th Cir. 2014) (discussing waiver of sovereign immunity under the FCRA); *see also F.A.A. v. Cooper*, 566 U.S. 284, 291 (2012) ("Although this canon of interpretation requires an unmistakable statutory expression of congressional intent to waive the Government's immunity, Congress need not sate its intent in any particular way. We have never required that Congress use magic words.").

### D. Recent judicial decisions have held that the FCRA and a related consumer protection statute contain an unequivocal waiver of sovereign immunity.

The third major reason why Defendants' sovereign immunity defense fails is that judicial decisions interpreting both the FCRA and a related statute have concluded that both acts contain unequivocally waivers of that immunity. In particular, two Circuit Courts have reached the identical conclusion under the FCRA and the Equal Credit Opportunities Act ("ECOA"), 15 U.S.C.A. §§ 1691-1691f (West, Westlaw through Pub. L. No. 115-43). In *Bormes v. United States*, 759 F.3d 793 (7th Cir. 2014), the plaintiff filed a class action alleging that the USA issued him a receipt that did not comply with the Receipt Provision of the FCRA because it contained more than the last four digits of his credit card number. Just as here, the USA argued that the FCRA lacked an unequivocal waiver of sovereign immunity. The Seventh Circuit reasoned that

FCRA subjects any "person" to liability, that a "person" is defined to include "government or governmental subdivision or agency," and that the "United States is a government." As a result, the Seventh Circuit concluded, "[b]y authorizing monetary relief against every kind of government, the United States has waived its sovereign immunity." *Id.* at 795 (stating that Section 1681a(b) "waives sovereign immunity for all requirements and remedies that another section authorizes against any 'person'"); *accord Mooneyham v. Equifax Information Services, LLC*, 99 F. Supp. 3d 720, 726 (W.D. Ky. 2015) (1996 amendment to FCRA was an express waiver of sovereign immunity due to inclusion of the term "person" in damages section); *Talley v. U.S. Dep't of Agriculture*, 2007 WL 2028537, at *2 (N.D. Ill. Jul. 12, 2007) (holding that "the FCRA's inclusion of 'government or governmental subdivision or agency' among those persons potentially liable to an injured party serves as an express waiver of the [Government]'s sovereign immunity."); *Ingram v. Experian Info. Solutions, LLC*, 2017 WL 2507694, at *3 (N.D. Miss. Jun. 9, 2017) ("following the analysis in *Bormes* and *Moore* [discussed below], the court is convinced that the FCRA contains an unequivocal waiver of the United States' sovereign immunity").

Similarly, in *Moore v. U.S. Department of Agriculture*, 55 F.3d 991 (5th Cir. 1995), a married couple filed a law suit under ECOA against a federal government agency, alleging that the agency failed to extend them credit due to their race. The Fifth Circuit reviewed its jurisdiction to determine whether the USA waived sovereign immunity under the ECOA. *Id.* at 993-4. The Fifth Circuit reasoned that the "plain language of the ECOA provides that government entities are liable under the Act." *Id.* at 993 ("respectively defining 'creditor' to mean 'person,' and 'person' to mean 'government or governmental subdivision or agency'"). The Fifth Circuit held the Federal Government liable, explaining that Congress waived its sovereign immunity under ECOA due to the inclusion of "government or governmental

18

subdivision or agency" within the definition of "person" and by including "person" within the definition of "creditor." On two separate occasions, Senior Judge Paul L. Friedman of this Court determined that the Federal Government waived its sovereign immunity under ECOA for the same reasons expressed by the Fifth Circuit in *Moore*. *See Williams v. Conner*, 522 F. Supp. 2d 92, 98-99 (D.D.C. 2007) (holding that federal government waived sovereign immunity under ECOA because the terms "government or governmental subdivision or agency" are included in the statutory definition of "person"); *Benoit v. U.S. Dep't of Agric.*, 577 F. Supp. 2d 12 (D.D.C. 2008) (same).

Congress was well aware that including "government or governmental subdivision or agency" within the statutory definition of "person" would be interpreted as a waiver of sovereign immunity for various consumer protection statutes under the Federal Consumer Credit Protection Act. For this reason, Congress exempted any "government or government subdivision or agency" from ***all*** liability under the Truth in Lending Act ("TILA"), 15 U.S.C.A. §§ 1601-1667f (West, Westlaw through Pub. L. No. 115-43). The TILA regulates information provided to individuals in certain consumer financing transactions. The TILA originally and has always subjected a "creditor" to liability. 15 U.S.C.A. § 1640 (West, Westlaw through Pub. L. No. 115-43). A "creditor" is a "person" that satisfies certain other criteria. *Id.* § 1602(f). The term "person" includes the defined term "organization." *Id.* § 1602(e). "Organization" is defined to include any "government or governmental subdivision or agency." *Id.* § 1602(d), (e).[6] Because Congress understood that the defined term "creditor" would include the Federal Government as a "person," Congress included a statutory provision "expressly preserv[ing] the United States' sovereign

---

[6] This definition has remained unchanged since the original enactment of the TILA in 1968. *See* Consumer Credit Protection Act, Pub. L. No. 90-321, § 103(c), 84 Stat. 146, 147 (1968).

immunity against TILA claims." *Moore v. U.S. Dep't of Agric.*, 55 F.3d 991, 994 (5th Cir. 1995); *see also* TILA, § 1612(b) ("Effect on government agencies") ("No civil or criminal penalty provided under this subchapter for any violation thereof may be imposed upon the United States or any department or agency thereof, or upon any State or political subdivision thereof, or any agency of any State or political subdivision."). As the Fifth Circuit observed, "[c]learly, TILA indicates that Congress intended 'government or governmental subdivision or agency' to include the United States, because otherwise it would not have specifically preserved the United States' immunity unless it believed that such immunity had been previously waived." *Moore*, 55 F.3d at 994.

In addition, Congress exempted any "government or government subdivision or agency" from liability for punitive damages under the ECOA (but not for actual damages). *See* 15 U.S.C.A. § 1691e(b) (West, Westlaw through Pub. L. No. 115-43). Under the ECOA, a "creditor" includes any "person" that engages in certain defined conduct. *See id.* § 1691a(e). "Person" is defined to include any "government or governmental subdivision or agency[.]" *Id.* § 1691a(f). The ECOA subjects any "creditor" to liability for "actual damages sustained" and to liability for "punitive damages in an amount not greater than $10,000." *Id.* § 1691e(a) & (b). Notably, however, while any "creditor" is liable for actual damages, only a creditor "other than a government or governmental subdivision or agency" is liable for punitive damages under the ECOA. *Id.* When the ECOA was originally enacted in 1974, it did not exempt "government or government subdivision or agency" from liability for punitive damages. Act of Oct. 28, 1974, Pub. L. No. 93-495, sec. 503, § 706(b), 88 Stat. 1500, 1524-25 (codified, as amended, at 15 U.S.C.A. §§ 1691-1691f (West, Westlaw through Pub. L. No. 115-43)). Two years later, Congress amended the ECOA to add an exemption from punitive damages for a "government or

governmental subdivision or agency." Equal Credit Opportunity Act Amendments of 1976, Pub. L. No. 94-239, sec. 6, § 706(b), 90 Stat. 251, 253-54. In a committee report accompanying one version of the bill that ultimately became law, Congress noted that this amendment to section 706(b) of the ECOA (15 U.S.C. § 1691e(b)) would "specifically exclude[] any Government or governmental subdivision or agency from liability for punitive damages." H.R. Rep. No. 94-210, at 9 (1975). By including an exemption only from punitive damages for "government or government subdivision or agency," Congress made clear that any "government or government subdivision or agency" had been subject to liability for actual and punitive damages under the ECOA, as originally enacted.[7]

Congress's decision to not include any exemption from liability for any kind of damages for "government or governmental subdivision or agency" in the FCRA, unlike the provisions contained in the TILA and the ECOA, is further proof that Congress intended the FCRA to waive sovereign immunity.[8] This is especially true since the TILA was enacted in 1968 (before FCRA) and included the express anti-waiver provision, and because the ECOA was enacted in

---

[7] The punitive damages exemption added to the ECOA refutes Defendants' argument that Congress would not have subjected the Federal Government to punitive damages under FCRA. *See* Motion at 17. Moreover, Judge Easterbrook of the Seventh Circuit convincingly dealt with this argument by stating that if "the interaction of § 1681a(b) and § 1681n(a)(2) creates excessive liability—which it won't if federal officers obey the statute—then the solution is an amendment, not judicial rewriting of a pellucid definitional clause." *Bormes v. United States*, 759 F.3d 793, 796 (7th Cir. 2014).

[8] The Telephone Consumer Protection Act ("TCPA"), 47 U.S.C.A. § 227 (West, Westlaw through Pub. L. No. 115-43) also subjects any "person" to liability for violations under the TCPA. For the entire chapter of the U.S. Code in which the TCPA is codified, the term "person" is defined as "an individual, partnership, association, joint-stock company, trust, or corporation." *Id.* § 153(39). Notably absent from this definition of "person" is the phrase "government or governmental subdivision or agency," which is included within the definition of TILA, ECOA and FCRA. For this reason, it is not surprising that the Federal Communications Commission determined that the term "person" under the TCPA does not include the Federal Government. *See* Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, CG Docket No. 02-278, FCC No. 16-72 (Jul. 5, 2016).

1974 (after FCRA) and was amended to exempt government agencies from liability for punitive damages thereafter. *See Moore v. U.S. Dep't of Agric.*, 55 F.3d 991, 994 (5th Cir. 1995) ("Considering that ECOA was passed after TILA and does not include an express preservation of U.S. sovereign immunity as did TILA, we conclude that Congress intended to waive U.S. immunity in the ECOA."); *Ingram v. Experian Info. Solutions, LLC*, No. 3:16-cv-00210-NBB-RP, 2017 WL 2507694, at *3 (N.D. Miss. June 9, 2017) (recognizing that "the FCRA, like the ECOA, does not contain an explicit preservation of immunity as found in the TILA" and that "like the ECOA, the FCRA was passed after the TILA").

There fourth major reason that defeats Defendants' sovereign immunity argument is that, even if this Court were to accept the contention that Congress could not have understood that it was waiving the Federal Government's sovereign immunity under the FCRA as the statute stood before 1996, no such ignorance could be reasonably imputed to Congress after any "person" became subject to liability by virtue of the 1996 amendments. In determining what group would be subject to the Receipt Provision in 2003, Congress chose any "person" that "accepts credit cards or debit cards" and electronically prints receipts. There is no basis to argue that the term "person" in the Receipt Provision should have any meaning different from the meaning assigned to it in the FCRA remedies section. Since FACTA (and specifically the Receipt Provision) became law in 2003, well after the 1996 amendment subjecting any "person" to liability under the FCRA, Defendants' argument that Congress might not have been aware of the ramifications of subjecting any "person" to liability finds no support in the text or history of the statute.

For all these reasons and in accordance with a plain reading of FCRA's statutory language and in comparison to the statutory language of the ECOA and TILA, the FCRA

contains an express and unequivocal waiver of the Federal Government's sovereign immunity.[9]

Consequently, there is no basis to dismiss this action as barred by such immunity.

## IV.   PLAINTIFF HEUER HAS ESTABLISHED THAT HE HAS CONSTITUTIONAL STANDING BECAUSE HE HAS ALLEGED FACTS PLAUSIBLY SHOWING THAT HE SUFFERED A PARTICULARIZED AND CONCRETE INJURY.

Beyond contending that Mr. Heuer's claims are barred by sovereign immunity, Defendants argue that he lacks constitutional standing because the Amended Complaint fails to allege that he suffered a "concrete" injury resulting from Defendants' undisputed FCRA violation. (Motion at 18-27.) This is a unique position for the USA to take considering that it recently took the opposite position in a case in which the same alleged statutory violation was at issue. *See Hammer v. Sam's East, Inc*., 754 F.3d 492, 497 (8th Cir. 2014) (noting that "the United States subsequently filed a brief taking the position that appellants maintain Article III standing to bring their [FACTA] claim"). Prior to this litigation, the USA's position has been that a violation of the FCRA (and specifically the Receipt Provision), constitutes an injury in fact sufficient to grant this Court subject matter jurisdiction over this case.[10]

---

[9] Both the Fourth and Ninth Circuit wrongly decided that the FCRA does not contain an unequivocal waiver of sovereign immunity for damages against the Federal Government. *Robinson v. United States Dep't of Educ*., 917 F.3d 799 (4th Cir. 2019); *Daniel v. Nat'l Park Serv*., 891 F.3d 762 (9th Cir. 2018). These cases did not consider the waiver of sovereign immunity from the right time period (1970, rather than 1996), jumped through hoops to avoid the plain meaning of the statutory definitions, and analyzed the wrong statutory equivalents (did not consider ECOA or TILA—which both contain express language preserving either full sovereign immunity or partial sovereign immunity), so these cases have little persuasive value.

[10] In *Hammer v. Sam's East, Inc*., 754 F.3d 492, 497 (8th Cir. 2014), the issue was whether a consumer who alleged no actual damages caused by a violation of the FCRA's Receipt Provision suffered an injury in fact sufficient to give the plaintiff constitutional standing. The USA intervened in the appeal and filed a brief in support of the consumer, arguing that, "A Consumer Who Alleges A Violation of FACTA's Truncation Provision, But Does Not Allege Actual Damages Due To That Violation, Has Suffered Sufficient Injury-In-Fact To Confer Article III Standing." Brief for the USA as Intervenor, *Hammer v. Sam's East, Inc*., 754 F.3d 492 (8th Cir. 2014) (Nos. 12-3724, 12-3858), 2013 WL 6221843, at *3-7. Now that it is facing a FCRA claim as a Defendant, the USA appears to want to change its position. But that is hardly a

Federal jurisdiction requires standing—an actual "case or controversy" under Article III of the United States Constitution. Standing only exists when a plaintiff has suffered an injury in fact. An injury in fact must be both particularized and concrete—"that is, it must actually exist." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016). Elaborating on the meaning of concreteness, the Supreme Court distilled several "general principles" from its prior cases. *Id.* at 1550. First, it acknowledged that, although tangible injuries (like physical or economic harm) are "perhaps easier to recognize" as concrete injuries, "intangible injuries can nevertheless be concrete," as can injuries based on a "risk of harm." *Id.* at 1549. Second, "[i]n determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles." *Id.* Thus, if the "alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts"—or, put differently, if "the common law permitted suit" in analogous circumstances—the plaintiff will have suffered a concrete injury that can be redressed by a federal court. *See id.*; *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998) (explaining that Article III encompasses "cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process").

But the plaintiff need not necessarily identify a common-law analogue to establish a concrete injury arising from a violation of a statutory right, because Congress has the power (and is in fact "well positioned") "to identify intangible harms that meet minimum Article III requirements," even if those harms "were previously inadequate in law." *Spokeo*, 136 S. Ct. at 1549. Accordingly, the third principle emphasized in *Spokeo* is that Congress can elevate the

---

proper justification for allowing the Government to take one position before the Eight Circuit and the diametrically opposite position before this Court. At the very least, the Government should be required to explain how the case at bar is different, either factually or legally, from *Hammer*.

violation of even procedural rights to a concrete injury if they protect against an identified harm. Of course, "a bare procedural violation, divorced from any concrete harm" identified by Congress, will not give rise to an Article III injury.[11] *Id.* (quoting *Summers v. Earth Island Institute*, 555 U.S. 488, 496 (2009)). But a "person who has been accorded a procedural right to protect his concrete interests" has standing to assert that right. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992); *Strubel v. Comenity Bank*, 842 F.3d 181, 189 (2d Cir. 2016) ("where Congress confers a procedural right in order to protect a concrete interest, a violation of the procedure may demonstrate a sufficient 'risk of real harm' to the underlying interest to establish concrete injury without 'need [to] allege any *additional* harm beyond the one Congress has identified.'") (quoting *Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1549) (emphasis in original). In *Spokeo*, the Supreme Court offered no opinion on whether the FCRA violation at issue in that case was "concrete" or whether the plaintiff had standing to pursue the FCRA violation in federal court. The D.C. Circuit, however, recently determined that the FCRA Receipt Provision is such a statute and provides a procedural right to protect concrete interests. *Jeffries v. Volume Services America, Inc.*, 928 F.3d 1059, 1064 (D.C. Cir. 2019).

In addition, Defendants' alleged violation of the FCRA Receipt Provision caused Mr. Heuer a well-established cognizable injury sufficiently similar to a common law cause of action—invasion of privacy, breach of confidence, and/or an increased risk of identity theft—to confer Article III standing. *See, e.g.*, *Jeffries*, 928 F.3d 1059 (stating that the Receipt Provision is closely related to the common law cause of action for breach of confidence); *Hancock v. Urban*

---

[11] The Supreme Court identified the "dissemination of an incorrect zip code" in violation of one of the FCRA's requirements as an example of "a bare procedural violation, divorced from any concrete harm." *Spokeo*, 136 S. Ct. at 1550 (footnote omitted); *see also Hancock v. Urban Outfitters, Inc*., 830 F.3d 511, 514 (D.C. Cir. 2016) (holding that the "mere request for a zip code, standing alone, [did not amount] to an Article III injury").

*Outfitters, Inc*., 830 F.3d 511, 514 (D.C. Cir. 2016) (suggesting that a statutory cause of action that is premised on an "invasion of privacy, increased risk of fraud or identity theft, or pecuniary or emotional injury" would satisfy the requirements of Article III standing); *Muransky v. Godiva Chocolatier, Inc*., 905 F.3d 1200 (11th Cir. 2018) (holding that standing "also independently rests on the similarity between the harm he alleges and the common law tort of breach of confidence"). Mr. Heuer has alleged that Defendants invaded his privacy, breached his confidence, and increased the risk that his identity would be stolen when Defendants disclosed his personal, confidential, and sensitive financial information by electronically printing a receipt that did not conform to the Receipt Provision, and by forcing Mr. Heuer to show that electronically printed receipt to a third-person.

Because invasion of privacy is a quintessential "harm that has traditionally been regarded as providing a basis for a lawsuit in English and American courts," it is a legally cognizable injury for standing purposes. *Spokeo*, 136 S. Ct. at 1549. For more than a century, American courts have recognized that "[o]ne who invades the right of privacy of another is subject to liability for the resulting harm to the interests of the other." RESTATEMENT (SECOND) OF TORTS § 652A (Am. Law Inst. 1977); *see also* cmt. a (noting that "the existence of a right of privacy is now recognized in the great majority of the American jurisdictions"). In his seminal 1890 article on the right to privacy, Justice Brandeis explained even then that "what is ordinarily termed the common-law right to intellectual and artistic property are . . . but instances and applications of a general right to privacy." Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 HARV. L. REV. 193, 198 (1890). American courts at the turn of the century identified the right of privacy as "derived from natural law," and they traced the concept back to Roman and early English legal traditions. *Pavesich v. New England Life Ins. Co*., 50 S.E. 68, 70 (Ga. 1905).

26

Importantly, common-law courts recognized claims for invasion of privacy or misuse of confidential information even without proof of a separate injury—the invasion itself was recognized as a distinct, concrete injury. As the Tenth Circuit explained, the "common law tort of invasion of privacy" created a remedy for "personal wrongs which result[ed] in injury to plaintiffs' feelings and [were] actionable even though the plaintiff suffered no pecuniary loss nor physical harm." *Parks v. IRS*, 618 F.2d 677, 683 (10th Cir. 1980); *accord Pichler v. UNITE*, 542 F.3d 380, 398–99 (3d Cir. 2008). Because these injuries involve such an important—though intangible—interest as one's personal identity, courts have long held that common-law claims based on an invasion of privacy do not require any showing of separate injury to be viable. As Justice Brandeis explained, the common-law action against unauthorized publication "does not turn upon the form or amount of mischief or advantage, loss or gain. The author of manuscripts, whether he is famous or obscure, low or high, has a right to say of them, if innocent, that whether interesting or dull, light or heavy, saleable or unsaleable, they shall not, without his consent, be published." Warren & Brandeis, 4 Harv. L. Rev. at 198 n.6.

Two well-recognized types of invasion of privacy are the publication of private facts and intrusion upon seclusion.[12] An invasion of privacy due to the public disclosure of private facts occurs when information is publicized about someone's personal life that previously has not been revealed to the public, that is not of legitimate public concern, and the publication of which would be offensive to a reasonable person. RESTATEMENT (SECOND) OF TORTS § 652D (Am. Law

---

[12] The D.C. Circuit and the Eleventh Circuit also recognized the common law cause of action for breach of confidence can form the basis of a cognizable injury for purposes of standing as it is closely related to the type of harm that the Receipt Provision intended to cure. *Jeffries*, *Jeffries*, 928 F.3d at 1064-65 (stating that the Receipt Provision is closely related to the common law cause of action for breach of confidence); and *Muransky*, 905 F.3d 1200 (holding that standing "also independently rests on the similarity between the harm he alleges and the common law tort of breach of confidence").

Inst. 1977). Information about an individual's medical conditions, sexual orientation and history, and financial status are private facts. *Id.* at cmt. B ("Sexual relations, for example, are normally entirely private matters, as are family quarrels, many unpleasant or disgraceful or humiliating illnesses, most intimate personal letters, most details of a man's life in his home, and some of his past history that he would rather forget."). Private facts also may include someone's social security number, credit card number, bank account number, or phone number, if that information is not ordinarily publicly available. *See, e.g., Evans v. Dayton Newspapers, Inc.*, 566 N.E.2d 704, 707 (Ohio Ct. App. 1989) (reversing trial court's dismissal of complaint asserting claim for invasion of privacy based on allegation that defendant newspaper published articles discussing "plaintiff's private financial affairs, private business affairs, private professional affairs, and describ[ing] true and false private and/or unsavory incidents in the life of the Plaintiff"); *Pontbriand v. Sundlun*, 699 A.2d 856, 865 (R.I. 1997) (holding that allegations that Governor released details of plaintiffs' financial information, including names, Social Security Numbers, and bank account balances, to news media stated claim for "publication of private facts" and "have set forth a complaint that raises genuine issues of material fact").

Intrusion upon seclusion occurs when an entity intrudes either physically or otherwise upon the solitude or seclusion of another or their private affairs or concerns and the intrusion would be offensive to a reasonable person. RESTATEMENT (SECOND) OF TORTS § 652B (Am. Law Inst. 1977) (stating that the claim for intrusion upon seclusion "does not depend upon any publicity" and includes non-physical intrusions like "investigation or examination into his private concerns, as by opening his private and personal mail, searching his safe or his wallet, examining his private bank account").

Congress specifically enacted the FCRA to safeguard the privacy of a consumer's

personal and confidential financial information—like Mr. Heuer's credit card number—when such information is provided to another person, and to reduce the likelihood of identity theft and credit card fraud. As described above, and as the Supreme Court has recognized, the central purpose of the FCRA is to "protect consumer privacy." *Safeco Ins. Co. of America v. Burr*, 551 U. S. 47, 52 (2007) ("The Fair Credit Reporting Act has as one of its purposes to 'protect consumer privacy.'"); *TRW Inc. v. Andrews*, 534 U.S. 19, 23 (2001) (stating that FCRA was enacted in part to "protect consumer privacy"). More specifically, the Receipt Provision was enacted to reduce the risk of identity theft after determining that including the expiration date or more than the last five digits of a credit or debit card number on transaction receipts created an unacceptable risk of identity theft. *See* Fair and Accurate Credit Transactions Act of 2003, Pub. L. 108-159, secs. 111-157, 117 Stat. 1952, 1954-1968 ("An Act To amend the Fair Credit Reporting Act, to prevent identity theft"). The Receipt Provision is found in Title I, Subtitle A of the Act, which is captioned "Identity Theft Prevention."

Subsequently, Congress adopted an amendment to the liability component of the Receipt Provision. *See* Credit and Debit Card Receipt Clarification Act of 2007, Pub. L. 110-241, 122 Stat. 1565 (2008).[13] In so doing, Congress made these relevant findings with respect to the FCRA Receipt Provision and the Clarification Act:

(a) Findings.--The Congress finds as follows:

(1) **The Fair and Accurate Credit Transactions Act (commonly referred to as "FACTA") was enacted into law in 2003 and 1 of the purposes of such Act is to prevent criminals from obtaining access to consumers' private financial and credit information in order to reduce identity theft and credit card fraud**.

---

[13] The Clarification Act eliminated liability for merchants that failed to truncate the expiration date of the credit or debit card number for an additional limited period of time because Congress found that exposing only the expiration date without any of the digits in the account number other than the last five digits could not increase the risk of identity theft.

(2) As part of that law, the Congress enacted a requirement, through an amendment to the Fair Credit Reporting Act, that no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the card holder at the point of the sale or transaction.

(3) Many merchants understood that this requirement would be satisfied by truncating the account number down to the last 5 digits based in part on the language of the provision as well as the publicity in the aftermath of the passage of the law.

*          *          *

(5) None of these lawsuits contained an allegation of harm to any consumer's identity.

(6) **Experts in the field agree that proper truncation of the card number, by itself as required by the amendment made by the Fair and Accurate Credit Transactions Act, regardless of the inclusion of the expiration date, prevents a potential fraudster from perpetrating identity theft or credit card fraud**.

*          *          *

(b) Purpose.—**The purpose of this Act is to ensure that consumers suffering from any actual harm to their credit or identity are protected while simultaneously limiting abusive lawsuits that do not protect consumers** but only result in increased cost to business and potentially increased prices to consumers.

*Id.* § 2 (emphasis added). Congress made clear in this statute that the credit card account number is the "single most crucial piece of information that a criminal would need to perpetrate account fraud." 154 Cong. Rec. H3730 (daily ed. May 13, 2008) (statement of Rep. Mahoney). For this reason, Courts have recognized that an electronically printed receipt that discloses the last four digits of the credit card number (which FACTA permits) and the expiration date (which FACTA prohibits) does not confer standing. *Accord Bassett v. ABM Parking Servs., Inc.,* 883 F.3d 776, 783 (9th Cir. 2018) (no standing where plaintiff alleged FACTA violation by printing only expiration date on receipt); *Crupar-Weinmann v. Paris Baguette Am., Inc.,* 861 F.3d 76, 81 (2d

30

Cir. 2017) ("We find it dispositive that in 2007, Congress clarified FACTA in the Credit and Debit Card Receipt Clarification Act of 2007," making clear that "that Congress did *not* think that the inclusion of a credit card expiration date on a receipt increases the risk of material harm of identity theft."); *Meyers v. Nicolet Rest. of De Pere, LLC,* 843 F.3d 724, 727 (7th Cir. 2016) ("Congress has specifically declared that failure to truncate a card's expiration date, without more, does not heighten the risk of identity theft."). These cases have no bearing on the outcome of the pending matter, which is entirely controlled by the D.C. Circuit's recent opinion in *Jeffries* holding that the disclosure of more than the last five digits of a credit card number on an electronically printed receipt confers standing under the Receipt Provision. *See also Meyers*, 843 F.3d at 729 n.5 ("In a future case, the plaintiff may be able to show that a violation of the FACTA (or another provision of the FCRA) has caused him concrete harm."); *Crupar-Weinmann*, 861 F.3d at 81 n.1 ("This is not to say that it is impossible to allege a different 'bare procedural violation' of 15 U.S.C. § 1681c(g) for which some plaintiff might have standing.").

The D.C. Circuit recently determined that a violation of the Receipt Provision confers standing to maintain a claim similar to that alleged here. In *Jeffries*, a consumer brought a class action lawsuit alleging that she received an electronically printed receipt containing all sixteen digits of a credit card number in violation of the Receipt Provision. 928 F.3d 1059. The D.C. Circuit held that these allegations conferred her standing to proceed with her claim for damages. Specifically, the D.C. Circuit made the following relevant findings: (1) FACTA "vests consumers with a concrete interest in using their credit and debit cards without incurring an increased risk of identity theft[;]" (at 1064 (quoting *Muransky*, 922 F.3d at 1188)) ("FACTA itself does not prohibit the crimes of identity theft or fraud; its truncation requirement is a 'procedure[] designed to decrease th[e] risk' that a consumer would have his identity stolen");

(2) an increased risk of identity theft is concrete both because it has a "close relationship" to the common law tort of breach of confidence and because "Congress's judgment about when increased risk [of identity theft] becomes intolerable is entitled to respect[;]" (*id.* at 1064-65); and (3) the disclosure of more than the last five digits of a credit card number creates a "risk of real harm[.]" *Id.* at 1066.

Having held that FACTA provides consumers with a concrete interest, and setting the concrete interest as protecting consumers from an "increased risk of identity theft[,]" the only real question the D.C. Circuit left open for this court to resolve is whether the information on the electronically printed receipt creates a "risk of real harm" as of the moment the receipt is printed. The D.C. Circuit held that the full account number is sufficient to meet this standard, but did not provide a definitive opinion on any lesser disclosure. In this case, Mr. Heuer has alleged a lesser disclosure than the disclosure in *Jeffries*, but the result should be the same—Defendants provided Mr. Heuer with an electronically printed receipt containing the first four and last four digits of his credit card number and his name. In the first instance, this disclosure is more than the tolerable level set by Congress (the last five digits). Moreover, the electronically printed receipt connects the numbers associated with the account with Mr. Heuer because it contains his full name. With an American Express card only containing fifteen digits and Mr. Heuer's electronically printed receipt disclosing more than half of all the digits in his credit card, Mr. Heuer has alleged sufficient facts to identify a "risk of real harm."

But if that were not enough, the Court can take judicial notice that FACTA provided businesses the right to print the *last five digits* of any credit card number. Assuming most businesses abide by the law (even where the Federal Government refuses to do so), this would place an additional digit (the fifth to last digit) of Mr. Heuer's credit card in print on other

electronically printed receipts—raising the amount of information about his credit card number disclosed on electronically printed receipts to sixty percent (assuming every other vendor is acting within the limitations set by the Receipt Provision). This too, supports Mr. Heuer's "risk of real harm" caused by Defendants alleged FACTA violation.

Moreover, any holding that the printing the eight digits of a credit card number on an electronically printed receipt cannot possibly lead to a "risk of real harm" would eliminate the entire purpose of the Receipt Provision—to provide a uniform standard of electronically printing receipts so that taken together a fraudster would not be able to steal a person's financial account information. This is the reason that Congress settled on the last five digits of the credit card number, rather than requiring a merchant to truncate down to any five digits of the credit card number. Every digit of a credit card number other than the last five digits are now quite valuable to a fraudster.[14] Take, for instance, a fifteen-digit credit card number that for the sake of argument appears as follows:

1  2  3  4  5  6  7  8  9  0  1  2  3  4  5.

Now lets assume a merchant printed the first four and last four digits of the credit card number on a receipt as did Defendants in this case (disclosed numbers with emphasis):

**<u>1</u>  <u>2</u>  <u>3</u>  <u>4</u>**  5  6  7  8  9  0  1  **<u>2</u>  <u>3</u>  <u>4</u>  <u>5</u>** (disclosure #1).

---

[14] For this reason, Defendants assertion that disclosing the first four digits of a credit card number does nothing more than identify the "financial institution" and the "type of card" (Motion at 23) actually contradicts the assertion it was attempting to prove. Disclosing eight digits of a credit card number (four of which are required to remain concealed) increases the amount of information available to a fraudster and increases the risk of identity theft. Moreover, Defendants assertion that the first four digits are not personal to the consumer (*id.*) is also incorrect. The information contained in the first four digits exclusively relate to the consumer because it identifies the type of card and the issuing bank—pieces of information the Receipt Provision required merchants to conceal. Digits one through four are no less personal to the consumer than the fifth or sixth digits in the credit card number in that they are only included within the credit card number to identity specific information about the consumer's account.

  
A second merchant prints only four digits of the credit card number (disclosed numbers with emphasis):

1  2  3  4  <u>**5**</u>  <u>**6**</u>  <u>**7**</u>  <u>**8**</u>  9  0  1  2  3  4  5 (disclosure #2).

A third merchant also prints only three digits of the credit card number (disclosed numbers with emphasis):

1  2  3  4  5  6  7  8  <u>**9**</u>  <u>**0**</u>  <u>**1**</u>  2  3  4  5 (disclosure #3).

In this scenario, according to Defendants, a consumer would not meet the requirement of a "real risk of harm" for disclosure #1, #2, or #3. But taken together, the three disclosures provide the same amount of detail as the receipt issued in *Jeffries* and would be a complete disclosure of a consumer's financial account information. So of course, disclosing any additional digit of a credit card number other than the last five digits increases the likelihood of identity theft and creates a "real risk of harm[.]"[15]

Congress created a procedural right (a right for consumers to have their credit card information truncated on electronically printed receipts) in the Receipt Provision and additionally based on the historically analogous common-law right to privacy, breach of confidence, and the increased risk of identity theft.[16] The Supreme Court explained in *Spokeo*

---

[15] Contrary to Defendants' assertion, the D.C. Circuit does not cite favorably to *Kamal v. J. Crew Group*, 918 F.3d 102, 117 (3d Cir. 2019). The D.C. Circuit cites favorably to *Muransky* for all purposes with the exception that the D.C. Circuit stops short of stating that any disclosure greater than the last five digits on an electronically printed receipt is sufficient for standing. The D.C. Circuit's main gripe with *Kamal* is that the Third Circuit used the wrong standard to determine the "risk of real harm." The Third Circuit looked at how close the consumer came to suffering an actual identity theft, while the D.C. Circuit looked at whether the disclosure of additional credit card digits increased the risk of identity theft. *Jeffries*, 928 F.3d at 1067 n.3.

[16] In addition to creating the procedural right under the FCRA Receipt Provision, Congress completely preempted a claimant from filing any invasion of privacy cause of action under the common-law or any state statute based on the requirements enumerated in the FCRA Receipt Provision. 15 U.S.C.A. § 1681t(b)(5)(A) (West, Westlaw through Pub. L. No. 115-43)

that "Congress may 'elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 578 (1992)). Just as common law courts have long exercised authority to address new problems that arise over time without changing the essence of the legal claim at issue, Congress has used legislation to apply a well-established right to new contexts. *See, e.g.*, RESTATEMENT (FIRST) OF TORTS § 1 cmt. e, at 4 (Am. Law Inst. 1939) ("The entire history of the development of Tort law . . . shows a continuous tendency to recognize as worthy of legal protection interests which previously were not protected at all."). Here, however, Congress recognized that the release of a consumer's personal and confidential financial information harmed individual privacy interests and increased the risk that a consumer would be subjected to identity theft—a concrete injury that was considered adequate long before Congress enacted the FCRA. *See Spokeo Inc. v. Robins*, 136 S. Ct. 1540, 1551 (Thomas, J., concurring) ("In a suit for the violation of a private right, courts historically presumed that the plaintiff suffered a *de facto* injury merely from having his personal, legal rights invaded . . . . Many traditional remedies for private-rights causes of action . . . are not contingent on a plaintiff's allegation of damages beyond the violation of his private legal right.").

The Third Circuit Court of Appeals recently held that an alleged violation of the FCRA for the unauthorized disclosure of personal financial information "gives rise to an injury sufficient for Article III standing purposes." *In re: Horizon Healthcare Services Inc. Data Breach Litigation*, 846 F.3d 625, 629 (3d Cir. 2017) (stating that "'the unlawful disclosure of

---

("No requirement or prohibition may be imposed under the laws of any State . . . with respect to the conduct required by the specific provisions of . . . section 1681c(g) [the Receipt Provision]"). It would be incongruous for Congress to take away a cause of action under existing state laws if the Congress did not believe it was creating a federal right where the stated goal was to protect consumers and prevent identity theft.

legally protected information' constituted 'a clear *de facto* injury'" and noting that "Congress has long provided plaintiffs with the right to seek redress for unauthorized disclosures of information that, in Congress's judgment, ought to remain private.") (*quoting In re: Nickelodeon Consumer Privacy Litigation*, 827 F.3d 262, 274 (3d Cir. 2016)). The Third Circuit reasoned that:

> But with the passage of the FCRA, Congress established that the unauthorized dissemination of personal information by a credit reporting agency causes an injury in and of itself—whether or not the disclosure of that information increased the risk of identity theft or some other future harm . . . . And since the "intangible harm" that FCRA seeks to remedy "has a close relationship to a harm [i.e. invasion of privacy] that has traditionally been regarded as providing a basis for a lawsuit in English or American courts," *Spokeo*, 136 S.Ct. at 1549, we have no trouble concluding that Congress properly defined an injury that "give[s] rise to a case or controversy where none existed before."

*Id.* at 639 (citation and internal quotation marks omitted); *Susinno v. Work Out World Inc.*, 862 F.3d 346 (3rd Cir. 2017) ("When one sues under a statute alleging 'the very injury [the statute] is intended to prevent,' and the injury 'has a close relationship to a harm . . . traditionally . . . providing a basis for lawsuit in English or American courts,' a concrete injury has been pleaded.").

The Supreme Court has already specifically acknowledged the Congressional determination that the FCRA's Receipt Provision was enacted to "protect consumer privacy." *United States v. Bormes*, 568 U.S. 6, 7 (2012); *cf. also Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017) (holding that the Telephone Consumer Protection Act (TCPA) was enacted to avoid invasion of privacy associated with unsolicited telephone calls and that Congress established a "substantive right to be free from certain types of phone calls and texts"). Because there can be no doubt that harm to an individual's privacy traditionally has been regarded as a cognizable basis for suit and that the FCRA's Receipt Provision was enacted to

enhance these individual privacy rights, rights that are well established under the common law, this Court should hold that Mr. Heuer's alleged privacy injury here is sufficiently concrete "to constitute injury in fact." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1544; *see also Hammer v. Sam's East, Inc*., 754 F.3d 492, 497 (8th Cir. 2014) (holding that claimant had standing to bring suit for violation of FACTA). The type of harm Congress sought to prevent when enacting the FCRA (invasion of privacy) and specifically the Receipt Provision of FACTA (disclosure and release of confidential financial information) is the very harm that Mr. Heuer alleges he suffered when Defendants printed the first four digits of his credit card account information on a receipt at the point of sale in addition to the last four digits and his full name. *See Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016). The USA agrees: "FACTA's truncation provision, enforced through FCRA's civil liability provision, is therefore a paradigmatic example of a statute that has 'create[d] legal rights . . . , the invasion of which can create standing to sue." Brief for the USA as Intervenor, *Hammer v. Sam's East, Inc*., 754 F.3d 492 (8th Cir. 2014) (Nos. 12-3724, 12-3858), 2013 WL 6221843, at *5. For these reasons, Mr. Heuer has alleged facts plausibly establishing his standing to bring a claim for violation of the Receipt Provision.

## CONCLUSION

For all the foregoing reasons, Defendants' Motion to Dismiss should be denied in all respects.

Dated: October 24, 2019

Respectfully submitted,

**SHULMAN, ROGERS, GANDAL**
**PORDY & ECKER, P.A.**


By:          /s/ Glenn C. Etelson
            Glenn C. Etelson, Esq. (DC Bar ID #426246)
            Allison Baker Shealy, Esq. (DC Bar ID #478202)
            12505 Park Potomac Avenue, Sixth Floor
            Potomac, MD 20854-6803
            Telephone: (301) 230-5200
            E-mail:   getelson@shulmanrogers.com
                     ashealy@shulmanrogers.com


                     – and –

**Z LAW, LLC**


By:          /s/ Cory L. Zajdel
            Cory L. Zajdel, Esq. (admitted *pro hac vice*)
            2345 York Road, Suite #B-13
            Timonium, MD 21093
            Telephone: (443) 213-1977
            E-mail: clz@zlawmaryland.com

            *Counsel for Plaintiff Neil H. Heuer and*
            *All Proposed Class Plaintiffs*